[No. H037217. Sixth Dist. Nov. 6, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
YVETTE RENEE FRANZEN, Defendant and Appellant.

1194

## Counsel

Katja Grasso, under appointment by the Court of Appeal, for Defendant and Appellant Yvette Renee Franzen.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent the People.

## Opinion

**RUSHING, P. J.**—Defendant Yvette Renee Franzen was found guilty by a jury of selling methamphetamine. On appeal she contends that the trial court erred by admitting evidence of an incriminating statement she made to a police officer. She also contends that the court should have sustained her hearsay objection to evidence that a Web site identified her as the owner of a cell phone used in the sale transaction. We conclude that the trial court could properly find that defendant's statement was not the product of interrogation, but that the court erred by admitting the evidence from the Web site under the "published compilation" exception to the hearsay rule. However we do not believe the error in admitting this evidence is likely to have affected the verdict. Accordingly we will affirm the judgment.

### BACKGROUND

Detective Mark Barry of the Santa Clara Police Department testified that in January 2011, he posted several advertisements on craigslist expressing a

desire to purchase methamphetamine. He received a "call," apparently meaning a text message, from a number with a 503 area code, indicating that the caller had methamphetamine for sale. Detective Barry did not succeed in arranging a purchase at that time but continued to send messages expressing interest, and, on March 2, he received a reply expressing willingness to make the sale. Detective Barry requested an "eightball," meaning one-eighth of an ounce, or 3.5 grams. Through an exchange of text messages and, apparently, voice conversations with a male identifying himself as "Shannon," he negotiated a price of $250, which included a $25 delivery charge, since the methamphetamine was "coming from San Francisco."

Detective Barry subsequently made delivery arrangements with another male, identifying himself as "Joe," at the same 503 number. Initially the transaction was to occur on March 2 at a coffee bar, but it did not go through that night. The detective suggested, and it was agreed, that the purchase take place the next day at an apartment complex in Santa Clara that police had used for such transactions in the past. At around 1:00 that afternoon the detective received a call from a male, apparently "Joe," from a phone with a number in the 650 area code, saying that he would meet the detective at the specified address at 3:30 p.m. Detective Barry testified that he then determined "who that cell phone belonged to" by using "a tool that the police department uses," i.e., "an internet website called Entersect." The number "came back to Yvette Franzen." He received additional messages from that number, which were "[b]asically, just trying to get the directions" to the meeting place. He got a call saying the sellers would arrive and wait for him in a blue Honda Civic with black rims. The caller confirmed that the detective "had the money," and the detective sought assurances "that the weight was going to be correct; that I wasn't going to be light," which was "street language for making sure they weren't going to short me for the amount of drugs I was going to be buying."

At some point Detective Barry received a call from "Joe" saying that he was at the arranged location. Detective Barry arrived there around 3:15 p.m. He saw the blue Honda Civic parked in a carport by itself. He called the seller, presumably at the 650 number, and a female answered, saying, "We are here," and asked his location. After they spoke for perhaps 10 seconds, he said, "Okay, I see you." He walked to the Honda and approached the passenger side of the car, where defendant was sitting. He said, "Hi" and "basically, 'Are you Joe?' " to which the driver, later identified as Jeffrey Thomas Umbertas, said, "Yes." Defendant said, "Why don't you get in the back," and started to move her seat forward so the detective could enter the two-door vehicle. A department policy forbade him to comply with this suggestion, so he circled to the driver's side, where he and Umbertas eventually consummated the sale of a substance later confirmed to be methamphetamine.

After talking to the occupants of the car for another 30 or 45 seconds, Detective Barry "initiated the bust signal." Other officers "who were at prearranged locations in the complex came in and arrested both subjects." After the arrest defendant was found to be carrying a cell phone in her bra. Detective Barry "pulled up the phone number on that phone"; it matched the 650 number with which he had been communicating that day.

Defendant was charged with (1) transportation, sale, or distribution of methamphetamine (Health & Saf. Code, § 11379, subd. (a)); (2) possession of controlled substance paraphernalia, to wit, an opium pipe (Health & Saf. Code, § 11364); and (3) using and being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)). After the close of evidence she entered pleas of no contest to the second and third counts. The jury returned a guilty verdict on count 1. The trial court imposed a sentence of two years in prison, but suspended execution and placed defendant on probation with conditions including one year in county jail. Defendant filed this timely appeal.

## Discussion

### I. *Miranda*

#### A. *Background*

Officer Bill Buckleman testified that he was assigned to pick up defendant at the site of the arrest and transport her to a temporary holding facility at the police department. When he picked her up she was in handcuffs. Before placing her in his car he conducted a search for weapons or drugs. He saw a phone on the left side of her brassiere, but left it there because it did not pose a threat to his safety. When they arrived at the holding facility, she remained in handcuffs while he seated her in a chair and began to ask her some medical questions as part of the booking process. As she sat there "her phone began to ring." He told her he would "let her get the phone after I was done questioning her and after the handcuffs were taken off." She said, "It's probably the guy looking for his money." He said, "What guy?" She replied, "The guy that gave my friend the drugs to sell, I guess."

Defendant contends that the court erred in admitting this testimony because her statements to Officer Buckleman were obtained in violation of the *Miranda* rule. (See *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).) She raised this objection in writing below, leading to a hearing under Evidence Code section 402. When asked at the hearing to explain the question he put to defendant, the officer said, "It seemed like rhetorical—I mean, she said: 'It must be that guy.' [¶] So, I was, 'What guy?'

She was talking to me, so I was instinctively just saying, 'What guy?' " At the conclusion of the hearing the court ruled defendant's statement admissible, finding that it had not been the product of custodial interrogation: "The officer was merely asking the defendant some administrative questions; most likely that would result in how she was going to be housed in the facility. [¶] In terms of cell phones, cell phones are everywhere. Two of them went off during jury selection in this process. And the court is satisfied that the defendant's statement was spontaneously made. [¶] The officer's follow-up question, 'What guy,' was not intended to elicit an incriminatory response. Certainly, it wasn't anything that was probing. It was mainly conversational. [¶] And, also, the defendant's statement was made voluntarily. [¶] Therefore, the statement is admissible."

### B. Standard of Review

Here as below the pivotal issue is whether Officer Buckleman's question, "What guy?" constituted "interrogation" for purposes of the *Miranda* rule. "In reviewing the trial court's denial of a suppression motion on *Miranda-Edwards* grounds, 'it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.] To the extent mixed questions of fact and law are present, they are reviewed de novo if predominantly legal and for substantial evidence if predominantly factual. [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 385 [106 Cal.Rptr.3d 771, 227 P.3d 342] (*Gamache*).)

### C. Analysis

In *Miranda, supra*, 384 U.S. 436, 444, the Supreme Court prescribed "procedural safeguards . . . to secure the privilege against self-incrimination" to persons exposed to police questioning. The "safeguards" include the now famous *Miranda* warning, which notifies a defendant of the right to remain silent, the risk that anything he says may be used against him, the right to an attorney, and the right to an appointed attorney if he cannot afford to retain his own. (See *id.* at pp. 467–473, 479.) It is undisputed that no such warning was given to defendant before she made the incriminating statement at issue here. The admissibility of the statement therefore turns on whether the statement "stemm[ed] from custodial interrogation." (*Id.* at p. 444.) Since defendant was concededly in custody when she made the challenged statement, the pivotal question is whether the statement was the product of "interrogation."

The California Supreme Court has rejected claims that *Miranda* is violated where a defendant volunteers incriminating statements as part of a "casual conversation" (*People v. Lewis* (1990) 50 Cal.3d 262, 274 [266 Cal.Rptr. 834, 786 P.2d 892]) or in response to " 'neutral inquir[ies]' made for 'the purpose of clarifying [statements] or points that [the officer to whom a confession is volunteered] did not understand' " (*People v..Ray* (1996) 13 Cal.4th 313, 338 [52 Cal.Rptr.2d 296, 914 P.2d 846] (*Ray*), quoting *People v. Claxton* (1982) 129 Cal.App.3d 638, 647 [181 Cal.Rptr. 281]). Certainly such conversations or inquiries do not satisfy the conception of "interrogation" as commonly used and understood. While any question is "interrogative" in a purely grammatical sense, to "interrogate" in ordinary usage means not merely to pose an inquiry to a person but rather "to question [him] formally or systematically." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 612; see Oxford English Dict. <http://www.oed.com/view/Entry/98260> [as of Nov. 6, 2012] ["To ask questions of, to question (a person), esp. closely or in a formal manner; to examine by questions."].) Therefore, "[j]ust as custodial interrogation can occur in the absence of express questioning [citation], not all questioning of a person in custody constitutes interrogation under *Miranda*. [Citations.]" (*Ray, supra*, 13 Cal.4th at p. 338.)

In *Ray*, the defendant was serving time in a Michigan prison when he expressed a desire to talk about his past. (*Ray, supra*, 13 Cal.4th at pp. 327, 333.) He was put in touch with a prison investigator to whom he "volunteered his involvement in several crimes," including a fatal shooting outside a Bakersfield bar. (*Id.* at p. 327.) He explained that the crimes "would otherwise remain unsolved," and that since a coparticipant had died he "had been reading the Bible and wished to atone for his mistakes," and he "expressed concern that an innocent person might be accused of the crimes." (*Ibid.*) The investigator occasionally interrupted defendant's account "to interject 'yeah' or 'okay,' to repeat a statement defendant had just made, or to ask defendant about an ambiguity in his account." (*Id.* at p. 334, fn. omitted.) His questions were mostly "limited to the dates and locations of the various crimes and the fate of the victims, namely, whether they were 'tied up,' robbed of their cash and/or car, or otherwise 'hurt.' " (*Id.* at fn. 9.)

On appeal the defendant contended that this information, as well as the products of subsequent questioning by a Bakersfield detective, should have been suppressed under *Miranda*. The court concluded that the statements to the Michigan investigator were not the products of interrogation because the defendant, acting for "reasons that were entirely personal," had "initiated contact" with Michigan officials for the purpose of disclosing his criminal conduct. (*Ray, supra*, 13 Cal.4th at pp. 337–338.) The court rejected his contention that the contact "became coercive at some unspecified point because [the investigator] asked questions." (*Id.* at p. 338.) The questioning "did not influence the manner in which defendant reported the crimes. The

entire confession was given in narrative, almost rambling form. To the extent [the investigator] interrupted and asked questions, they were merely 'neutral inquir[ies]' made for 'the purpose of clarifying [statements] or points that [he] did not understand.' (*People v. Claxton, supra,* 129 Cal.App.3d 638, 647, 653.) Nothing in the substance or tone of such inquiries was reasonably likely to elicit information that defendant did not otherwise intend to freely provide." (*Ibid.*) The court rejected an early judicial suggestion that when a suspect offers spontaneously to confess, the police may violate *Miranda* if they do anything more than "remain 'purely passive' and ask no questions." (*Id.* at fn. 11, quoting *People v. Matthews* (1968) 264 Cal.App.2d 557, 566–567 [70 Cal.Rptr. 756].) "[S]ubsequent developments in the law," wrote the court, "do not support such a rigid approach. . . . In determining whether the prophylactic requirements of *Miranda* apply, the purpose—not the form—of police interaction with a criminal suspect controls. Because prison officials did not attempt to elicit incriminating statements that defendant otherwise would not have made, the trial court properly determined that no *Miranda* violation occurred in the present case." (*Ray,* at p. 338, fn. 11.)

In *People v. Bradford* (1997) 14 Cal.4th 1005, 1027 [60 Cal.Rptr.2d 225, 929 P.2d 544] (*Bradford*), the defendant was being fingerprinted alongside "an unidentified detective applying for a license to be a private investigator." The latter told the defendant in a "casual tone" that he "looked 'like a traffic ticket,' " asking, " 'Is it just a warrant?' " (*Ibid.*) The defendant replied, "Murder." (*Ibid.*) Shortly thereafter, the unidentified detective left and the defendant, without further prompting, gave an account of the murder to two officers. (*Ibid.*) The Supreme Court held that the detective's "offhand" remark and question did not constitute interrogation, and that the defendant's volunteered statements two minutes later were admissible, although later questioning by officers was "custodial interrogation," and the defendant's responses to it should have been excluded. (*Id.* at pp. 1034–1035.)

■ In *Gamache, supra,* 48 Cal.4th 347, a booking deputy, while fingerprinting the defendant, asked whether he had been in the military and whether he had liked it. The defendant "replied that he had enjoyed it," and then made a series of highly incriminating statements, interspersed with questions by the deputy, i.e., "what had happened," "how he felt," and what had happened with respect to a second victim. (*Id.* at p. 384.) The Supreme Court held that the defendant's statements "were not the product of an interrogation." (*Id.* at p. 387.) " ' "Interrogation" consists of express questioning, or words or actions on the part of the police that "are reasonably likely to elicit an incriminating response from the suspect." ' [Citation.] 'Interrogation thus refers to questioning initiated by the police or its functional equivalent, not voluntary conversation. [Citation.] " 'Volunteered statements of any kind are not barred by the Fifth Amendment . . . .' " ' [Citation.] Consequently, the

police 'may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' [Citation.]" (*Id.* at pp. 387–388.)

"Under these rules," the court continued, "small talk is permitted." (*Gamache, supra*, 48 Cal.4th at p. 388.) The court found the deputy's remarks "even more innocuous" than the facts in *Bradford, supra*, 14 Cal.4th at page 1034; "objectively, there was no reason to suspect that inquiring about Gamache's military service would lead Gamache to volunteer his regret about failing to kill Peggy Williams or the other inflammatory remarks that followed. Deputy Ells's subsequent ' "neutral inquir[ies]" ' did not convert Gamache's volunteered admissions into the product of interrogation. (*People v. Ray*[, *supra*,] 13 Cal.4th 313, 338 . . . .)" (*Gamache, supra*, 48 Cal.4th at p. 388.)

█ In *Gamache* the exchange producing the incriminating statements was apparently triggered by an officer's "innocuous" question. Here the exchange was initiated entirely by defendant. Officer Buckleman's only contribution was to ask, "What guy?," in response to defendant's spontaneous reference to a "guy looking for his money." A more "neutral" question is difficult to imagine. It is possible—though the record contains no evidence on the point—that Officer Buckleman might have been able to foresee an incriminating response, i.e., that the only "guy" likely to be "looking for his money" was the provider of the drugs in whose sale defendant was implicated. But the trial court found, on substantial evidence, that the officer's question was merely a natural conversational response to defendant's own statement—a statement which, in form and content, invited the hearer to request clarification. If an arrestee suddenly says, "I wish I hadn't done it," and the officer to whom he is speaking responds, "Done what?," the prisoner has hardly been "interrogated" as most people would understand that term, even if it would appear on reflection that he was probably referring to the conduct that got him arrested. The officer is not seeking an incriminating answer; indeed, such an answer only becomes foreseeable upon supposing the arrestee to be guilty of the crime. The officer is simply giving a normal response to the arrestee's conversational opening. This is not "interrogation" as commonly understood or as contemplated by the foregoing authority. Accordingly, the trial court did not err in refusing to exclude evidence of defendant's reply.

II. *Hearsay*

A. *Background*

The defense filed a written motion seeking a hearing under Evidence Code sections 402 and 403 to determine the admissibility of "various cell phone

evidence that the prosecution intends to introduce through Officer Barry." This included testimony that upon receiving a call from the 650 phone number, Detective Barry "ran that phone number in 'Entersect', an online database, and the database listed that cell phone number as belonging to Yvette Franzen of South San Francisco." The first ground of objection asserted in the motion was that the evidence would offend "Evidence Code section 1523 which states 'oral testimony is not admissible to prove the content of a writing.' " The motion also asserted that the prosecution would be unable to establish a proper foundation for the Entersect evidence, and requested a hearing to "make a preliminary determination whether the evidence is sufficient to permit a jury to rely on it."

The court apparently heard the motion in chambers. As later recapitulated on the record, defense counsel's objections at that time were hearsay, lack of foundation, and "[t]he fact that, basically, oral testimony can't be used to prove the contents of the writing." The prosecutor's position, as recited for the record, was that the Entersect evidence came within the hearsay exception for "published compilation[s]" set forth in Evidence Code section 1340 (section 1340).[1] The court described its ruling as follows: "[I]n the event the People were able to establish the foundation pursuant to Evidence Code section 1340, that those statements would be eligible—or, rather, that evidence would be admissible, and that a 402 hearing was not necessary."

The subject came up at trial as follows. First, Detective Barry testified that at 1:00 o'clock on the day of the buy, he received a call from a number in the 650 area code, which was different from the number he had previously dealt with. The prosecutor asked if he was "able to determine who that cell phone belonged to." Defense counsel objected on grounds of foundation and hearsay. The court responded, "I believe she's attempting to establish the foundation. I will allow it." The detective then affirmed that he was able to identify the owner of the number. The prosecutor then asked, "How were you able to do that?," to which he replied, "There is a tool that the police department uses. It's an internet website called Entersect." He went on to describe it as "the internet-based site that the police department pays a fee for that, basically, keeps track or it has a database of telephone numbers. And if you enter in that number, it will tell whatever information that's out there within the internet that it might be assigned to." The prosecutor asked if it was "a compilation, a published compilation of phone numbers," to which the witness replied, "It is. It will come back with the closest hit, and then several other numbers if there is anything else listed or associated with that number. [¶] You can also use the same system for people, address, vehicles, what have you." He affirmed that it is "something that is done by a business," for which

---

[1] The prosecutor did not respond on the record to the defense objection under Evidence Code section 1523. That objection, however, is not pursued on appeal.

the department pays a fee. The prosecutor asked if it was "sort of a directory or a list," he said, "Yes, directory. That would be a good way to explain it." It was then that the prosecutor asked, "[S]o who did this phone number belong to?" He replied, "That particular number came back to Yvette Franzen."[2]

### B. Standard of Review

It is often said that a trial court's ruling on the admissibility of evidence is vested in that court's discretion and will not be disturbed on appeal unless that discretion was abused. (See, e.g., *People v. Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261], disapproved on another point in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243].) This is a somewhat oversimplified description. (See *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1222–1225 [98 Cal.Rptr.3d 459] (conc. opn. of Rushing, P. J.).) Any legal ruling involves three components: the law, the facts, and the application of the law to the facts. A trial court usually has the preeminent power to determine matters of fact— including, at least provisionally, any "preliminary fact" on which an evidentiary ruling may depend. (See Evid. Code, § 400 et seq.; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, §§ 60, 61, 75, pp. 109–111, 124–125.) However its determination as to the governing legal principles (see 3 Witkin, *supra*, Presentation at Trial, § 59, p. 108) is subject to independent appellate review (see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 322, p. 369 [function of reviewing court to "review errors of law"]; *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278]; *Miyamoto v. Department of Motor Vehicles, supra*, 176 Cal.App.4th at p. 1222 (conc. opn. of Rushing, P. J.) ["Since this court's power to decide questions of law is paramount to that of the trial court, we are entitled and indeed obliged to reverse any ruling that we find rests upon an error of law, provided of course the error was prejudicial."].)

Thus insofar as the trial court expressly or impliedly determined the historical facts bearing on admissibility, its ruling must be upheld so long as it is supported by substantial evidence. But insofar as the court selected and applied the governing legal principles, including the meanings of statutory terms, its ruling is subject to independent review.

---

[2] At this point the trial court had not yet definitively ruled the foundation sufficient to bring the evidence within an exception to the hearsay rule. Defense counsel should therefore have reiterated her objection. There is no contention before us, however, that the objection was not adequately preserved for appeal.

## C. *Error*

### 1. *The Published Compilation Exception*

■ The prosecution acknowledged that Detective Barry's testimony was hearsay, but offered it under the "published compilation" exception to the hearsay rule set forth at section 1340.[3] The statute predicates admissibility on the following conditions: (1) the proffered statement must be contained in a "compilation"; (2) the compilation must be "published"; (3) the compilation must be "generally used . . . in the course of a business"; (4) it must be "generally . . . relied upon as accurate" in the course of such business; and (5) the statement must be one of fact rather than opinion. (§ 1340.)

Here the presence of the last element was undisputed, as was the police department's status as a "business as defined in section 1270."[4] The admissibility of the statement therefore turned on whether the evidence before the trial court was sufficient to establish that the statement was taken from a "published compilation" that was "generally used and relied upon as accurate" in the course of the department's "business."

According to the drafters of the Evidence Code, section 1340 merely "codifie[d] an exception" to the hearsay rule "that ha[d] been recognized by statute and by the courts in specific situations." (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 264; cf. Tentative Recommendation and a Study Relating to The Uniform Rules of Evidence (Aug. 1962) 4 Cal. Law Revision Com. Rep. (1963) p. 338 [uniform rule on which § 1340 was ultimately based "ha[d] no counterpart in the California statutes," but there were "some indication in judicial decisions that this exception m[ight] exist in California"].) They cited three authorities illustrating statements within the exception: California Uniform Commercial Code section 2724, which authorizes proof of a commodity's market price by "reports in official publications or trade journals or in newspapers or periodicals of general circulation published as the reports of such market"; *Emery v. Southern Cal. Gas Co.* (1946) 72 Cal.App.2d 821, 824–826 [165 P.2d 695], which authorized the admission of standard annuity tables to show present value; and *Christiansen v. Hollings* (1941) 44 Cal.App.2d 332, 339–340 [112 P.2d 723], which held standard mortality tables admissible to show life expectancy.

---

[3] "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business as defined in Section 1270." (§ 1340.)

[4] "As used in this article, 'a business' includes every kind of business, governmental activity, profession, occupation, calling, or operation of institutions, whether carried on for profit or not." (Evid. Code, § 1270.)

Since the enactment of section 1340, the compilation exception has been applied in only a handful of published decisions, each of which shows a pronounced note of caution in its application. In *Miller v. Modern Business Center* (1983) 147 Cal.App.3d 632, 634 [195 Cal.Rptr. 279], the plaintiff sought to introduce a page from a published book "purport[ing] to show" that, contrary to the defendant's representations, a newer model copier had been available when the defendant sold the plaintiff a previous model. The court acknowledged that the book was a "published compilation" for purposes of section 1340 but held that insufficient foundation had been laid because there was no showing "either that this particular statement was generally used and relied upon as accurate in the course of business or that the particular statement is of a class of statements which is generally used and relied upon in the course of business." (147 Cal.App.3d at pp. 634–635, fn. omitted.)

In *In re Michael G.* (1993) 19 Cal.App.4th 1674 [24 Cal.Rptr.2d 260], a prosecution for possession of a substance containing toluene with intent to inhale it for intoxication, the trial court allowed the prosecution to prove the presence of toluene in a paint can by introducing the can's list of contents. The reviewing court sustained the ruling, writing that the trial court could properly "take judicial notice that the public relies on the dangers and antidotes listed on a label as a matter of common knowledge," and could reason from this that "the label was generally used and relied on as accurate in the course of a business . . . ." (*Id.* at p. 1678.) It limited this holding, however, to the disclosure of *hazardous* ingredients, noting that the disclosure of toluene was required under state and federal law (*id.,* at fn. 2) and that such disclosures would otherwise be against the interest of the manufacturer, which "would have no interest in proclaiming that the product contained such a substance if in fact it did not" (*id.* at p. 1678). The court also limited its holding "strictly to the *presence* of a hazardous substance, and not to its quantity or quality." (*Ibid.*)

In *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253 [11 Cal.Rptr.3d 317], the trial court admitted evidence of published market survey data to show the estimated number of persons exposed to particular magazines. The data were "considered the acknowledged industry standard for measuring and comparing readership of adults and teens in the same way that Nielsen is the standard for television ratings data and Arbitron the standard for radio listening data." (*Id.* at p. 1271.) The defendant objected to this evidence despite having itself relied pervasively on the same materials, or the same kind of materials, to develop its advertising strategy. (See *id.* at pp. 1271, 1273, 1274.) The opinion discloses no clear

argument for excluding the evidence.[5] The court nonetheless took great pains to review the indications of its reliability.

■ It appears from these decisions, as well as the authorities cited by the drafters, that the published compilation exception is not to be broadly or uncritically applied. One treatise describes the parallel federal rule as "actually narrow," having "gr[own] out of a tradition with distinct limits." (4 Mueller & Kirkpatrick, Federal Evidence (3d ed. 2007) § 8:101, p. 885, fn. omitted [discussing Fed. Rules Evid., rule 803(17), 28 U.S.C.].) It has been treated, explicitly or implicitly, as subject to overarching concerns about the reliability of statements offered in particular cases, and whether they possesses adequate indicia of trustworthiness to warrant presentation to the trier of fact as proof of the matter asserted.

This cautious approach is consistent with the general policies underlying the hearsay rule and its exceptions. The rule reflects a general supposition that out-of-court statements are often not a fair or reliable way to prove disputed facts. (See 1 Witkin, Cal. Evidence, *supra*, Hearsay, § 1, pp. 783–784.) Every exception rests on the premise that the conditions posited by the exception overcome the general aversion to such statements, largely because those conditions furnish some assurance that statements satisfying them are significantly more reliable than unsworn extrajudicial statements in general. (See *In re Michael G., supra*, 19 Cal.App.4th 1674, 1677.) In the case of section 1340, this exceptional "trustworthiness" is said to derive from "the fact that *the business community* generally uses and relies upon the compilation and by the fact that *its author knows the work will have no commercial value* unless it is accurate." (*Miller v. Modern Business Center, supra*, 147 Cal.App.3d 632, 635, italics added; see 4 Cal. Law Revision Com. Rep., *supra*, at p. 338; *U.S. v. Woods* (3d Cir. 2003) 321 F.3d 361, 364, quoting 5 Weinstein's Federal Evidence (2002) § 803.19[1] [" 'Reliability is assured because the compilers know that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting their product.' "]; *Conoco Inc. v. Department of Energy* (Fed.Cir. 1996) 99 F.3d 387, 393 [purchase summaries lacked "indicia of reliability" found in "commercial publications" because purchasers who prepared them "did not, by transmitting them to [plaintiff], stake their business or public reputations on the accuracy of the summaries"].)

Hearsay exceptions also commonly involve considerations of necessity, or at least efficiency, i.e., in the absence of the exception there might be no

---

[5] The objections may have rested on the assertion that "there was . . . no basis in the record to understand the procedures used to arrive at MRI's data." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 116 Cal.App.4th at p. 1275.) But surely this could furnish no ground for exclusion where in its own business, the objecting party had treated the challenged information, or information of identical character, as accurate. (See § 1340.)

practical substitute for the proffered evidence, which would therefore be withheld from the trier of fact despite its posited trustworthiness. (*In re Michael G., supra,* 19 Cal.App.4th at p. 1677 ["[E]xperience has shown that there are situations where it is impossible or impractical to present an actual witness, yet the proffered necessary evidence is inherently trustworthy under the circumstances"]; *U.S. v. Woods, supra,* 321 F.3d 361, 364, quoting 5 Weinstein's Federal Evidence, *supra,* § 803.19[1] [" 'As with other hearsay exceptions, the admissibility of market reports and commercial publications . . . is predicated on the two factors of necessity and reliability. Necessity lies in the fact that if this evidence is to be obtained, it must come from the compilation, since the task of finding every person who had a hand in making the report would be impossible.' "].)[6]

### 2. *"Published Compilation"*

■ We have concluded that the facts presented below were insufficient to establish that the Entersect Web site, or perhaps more precisely the database queried by Detective Barry through that Web site, was a "published compilation" for purposes of section 1340. The history, language, and rationale of section 1340 suggest that the exception contemplates an organized, edited presentation of a finite quantity of information that, if not printed on paper, has been recorded and circulated in some fixed form analogous to printing. Nothing in the record suggests that this was the case with the information introduced as evidence here.

Before using the phrase "or other published compilation," the statute lists four specific types of "compilation" that will come within its scope: A "tabulation" is an "arrangement in the form of a table or orderly scheme." (See Merriam-Webster's Collegiate Dict., *supra,* at p. 1199 ["tabulate" as "to put in tabular form"; "tabular" as "of, relating to, or arranged in a table, *specif.* set up in rows and columns"].) A "list" is "[a] catalogue or roll consisting of a row or series of names, figures, words, or the like." (Oxford English Dict., available online at <http://www.oed.com/view/Entry/108991> [as of Nov. 6, 2012].) A "directory" is "[s]omething that serves to direct; a guide; esp. a book of rules or directions." (*Id.,* <http://www.oed.com/view/Entry/53319> [as of Nov. 6, 2012].) And a "register" is "[a] book or volume in which important items of information of a particular kind are regularly and accurately recorded; a collection of entries so created; a written record or account." (*Id.,* <http://www.oed.com/view/Entry/161292> [as of Nov. 6, 2012].)

---

[6] The facts here do not suggest any "necessity" for the Entersect evidence. Traditionally the ownership of a phone number would be readily established by means of a subpoena directed to the custodian of records for the relevant telephone company, whose relevant business records would be unobjectionable. Nothing before the trial court suggested that procuring such evidence would have placed an undue burden on the prosecution.

We have previously questioned the utility of the constructional principle of *ejusdem generis*, under which " ' "general words follow[ing] the enumeration of particular classes . . . will be construed as applicable only to persons or things of the same general nature or class as those enumerated." ' " (*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1461 [44 Cal.Rptr.3d 72], quoting *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676].) As we acknowledged in our earlier discussion, the real challenge in such situations is to " 'determine what unmentioned particulars are sufficiently like those mentioned to be made subject to the act's provisions by force of the general reference.' " (*O'Grady*, at p. 1461, quoting 2A Singer, Statutes and Statutory Construction (6th ed. 2000) § 47.18, p. 289, fn. omitted.) Here all of the enumerated items have in common the presentation of information in a fixed, organized, and usually written form. Indeed this connotation is carried by the term "compilation" itself, which is defined as, "[t]hat which is compiled; a literary work or the like formed by compilation." (Oxford English Dict. <http://www.oed.com/view/Entry/37591> [as of Nov. 6, 2012.) "Compile" in turn is defined, "[w]ith reference to literary work, and · the like," as "[t]o collect and put together (materials), so as to form a treatise; to collect into a volume," and "[t]o make, compose, or construct (a written or printed work) by arrangement of materials collected from various sources." (*Id.*, <http://www.oed.com/view/Entry/37595> [as of Nov. 6, 2012; see Merriam-Webster's Collegiate Dict., *supra*, at p. 235 ["compile" as "to compose out of materials from other documents," or "to collect and edit into a volume"].)

It thus appears that the paradigmatic compilation is written, such that a "published" compilation is made public by printing, or an equivalent process. That characteristic may be thought to enhance its reliability in a number of respects: (1) it suggests that the publisher has made a financial investment in the publication, and is exposed to potential loss if it fails to sell; (2) it means that the content is *limited in quantity*, such that the publisher must exercise some kind of editorial discretion, probably including steps to confirm the accuracy of the matters included; (3) its content is also *fixed in time*, meaning that inaccuracies will persist (and the publisher's reputation will remain exposed to harm by their presence) into the indefinite future; and (4) the work is generally *circulated as a whole*, creating a risk for the publisher that all errors will eventually be exposed.

The database from which Detective Barry extracted the evidence at issue here bears virtually no resemblance to a "published compilation" as thus described. Typically, information in a database is not *presented to* users in any form, let alone a fixed form analogous to printing. Its contents are not permanently exposed to public scrutiny in their totality but are retrieved byte by byte through a process of querying or searching. Here, for instance, there

is no suggestion that anyone other than Detective Barry ever laid eyes on the particular piece of information he retrieved. From the user's perspective, a database bears less resemblance to an organized fixed presentation than to an invisible, shapeless mass of information. Such a mass may be a compilation in an *archaic* sense, i.e., a "[h]eaping or piling together; accumulation." (Oxford English Dict. <http://www.oed.com/view/Entry/37591> [as of Nov. 6, 2012].) But apart from consisting of a collection of information, it has none of the characteristics of a "compilation" in the modern sense.

To treat a database as a published compilation merely because it is accessible through a Web site would dramatically undermine the delicate balance of competing policies reflected in the hearsay rule, its exceptions, and the particular exception here under scrutiny. It is common knowledge by now that the World Wide Web, and more generally the Internet, provides ready access to information of all shades and degrees of accuracy, from the indisputably true to the inarguably false.[7] Of particular concern in a setting like the present one is the persistence in the digital universe of outdated information. A person's real-world link with a telephone number may be broken when she moves or changes carriers. But the link may continue to be reported in the universe of stored data simply because there is no effective way to purge it from all the digital repositories to which it may be propagated.[8] This phenomenon can be demonstrated by running a Web search on the name of any person known to have moved repeatedly; the chances are good of finding Web sites still associating that person's name with addresses from which he or she moved away years ago. We suspect that methods exist for weeding out such obsolete data and thus increasing the accuracy of the

---

[7] One 2005 study showed alarming error rates in consumer credit reports. (Pierce & Ackerman, Data Aggregators: A Study of Data Quality and Responsiveness (May 19, 2005) archived at <http://web.archive.org/web/20070319220412/ and http://www.privacyactivism.org/docs/DataAggregatorsStudy.html> [as of Nov. 6, 2012].) The study showed 9 percent of the telephone numbers reported by one data broker, and 67 percent of those reported by the other, were erroneous. (*Ibid.*) Of course, our reference to this study may be criticized on numerous grounds, including the likelihood that its figures are obsolete, that the study was small, and that no foundation has been laid with respect to the trustworthiness of the sources or methods on which it is based. But this would be an exceptionally ironic criticism here. This study is just as arguably a "published compilation," and the foundation for its consideration here is at least as solid, as was presented below in support of the challenged evidence from the Entersect site. Indeed, the article cited here bears more resemblance to the paradigmatic "compilation" because it consists of a fixed, written work rather than an amorphous mass of possibly ephemeral data entries.

[8] We believe it has not been unknown for a malicious application or Web site to "harvest" the contents of a computer user's personal address book. It takes no imagination at all to see that information so gathered could be a decade or more out of date. This will not prevent it from eventually being propagated so as to join, as the detective put it, "whatever information that's out there within the internet."

data retrieved, but there was no evidence to this effect here.[9] On the contrary, the evidence was that the site reported "whatever information that's out there within the internet that [a phone number] might be assigned to."

■ Section 1340 was manifestly not intended to permit the introduction over a hearsay objection of "information that's out there." "Information" does not become "evidence" merely because someone finds it worth seeing. The Internet contains, or more accurately is connected to and thus capable of conveying, a large and growing part of all of the recordable information in existence. Some of this information is as reliable as any traditional source of information. But some of it would be almost universally considered not only unreliable but extravagantly untrue. If this technology provides the means to store and convey every truth any human has ever articulated, it also has the capability of "publishing" every misconception, error, delusion, or outright lie anyone has ever set down. The world of print has known its share of infamous frauds, libels, and fantasies packaged as fact, but at least the cost and difficulty of publication has had some tendency to inhibit the circulation of erroneous information. That inhibition has now all but disappeared. And while the absence of barriers to publication may promise a true "marketplace of ideas," it also means that the mere fact of publication cannot be relied upon to furnish any assurance of reliability.

Nor is it only the act of publication that has been made cheap and easy. The creation of "content" may also be accomplished with virtually no effort or expense. Thus while the creation of a database from raw data can be costly, it is also possible to "harvest" or "aggregate" data from other digital sources automatically and virtually for free. Wherever the information may come from, nothing requires a database creator to take any particular steps to ensure its correctness. He may choose quantity over quality and leave it to users to verify the accuracy of the data they retrieve. When an inaccuracy is brought to the operator's attention it may be corrected with no one the wiser save the person who discovered it. And while the entire database may be accessible at any given time, it never achieves a final, unified form in which it is "published" to a mass audience.

This is not to suggest that electronically stored data as a whole is less trustworthy than printed data as a whole. But treating a Web site's database as a "published compilation" merely because a fee is paid for access would stray far from the conception underlying section 1340. Of course electronically stored data may take forms highly analogous to printed volumes; indeed

---

[9] Since the purpose of the Entersect site is to provide "investigative data" (see fn. 10, *post*), it is possible that its users would prefer that the data there *not* be aggressively pruned, since they might favor comprehensiveness over strict accuracy. There is little point in speculating on the subject, however, for the record is silent.

many printed volumes are now available in digital form. Mere conversion to a different format should not, by itself, interfere with the treatment of such materials as published compilations. But the Entersect site appears to have been much more—or for present purposes, less—than an electronic facsimile of a phonebook. As described by Detective Barry, it was an aggregation of whatever information the Web site operators could find associating names with phone numbers. Nothing remotely like this was contemplated by the drafters of section 1340.

We do acknowledge some evidence of one of the factors contributing to the rationale for section 1340. Detective Barry testified that the department "pays a fee" to use the Entersect site. This suggests that the site owner has a pecuniary motive to ensure that the information provided is useful to subscribers. As discussed in the following part, however, the nature of the use its subscribers apparently make of the information differs critically from the use and reliance underlying the posited trustworthiness of published compilations.

■ We conclude that the proponent of the evidence failed to establish that the Entersect site possessed characteristics that would justify treating its contents as a published compilation for purposes of section 1340.

### 3. *Nature of Required Use and Reliance*

This case raises a particular additional concern, which is the failure of the evidence below to satisfy the key condition that the compilation be "generally used and relied upon *as accurate* in the course of a business." Nothing in this record suggests that the information amassed on the Entersect Web site receives the kind of use and reliance contemplated by the exception. In the paradigmatic situation, a published compilation is a volume or other printed work in which a business *looks up* some *fact* that it will use in seeking financial gain or avoiding loss. A business trading in commodities relies on published prices in the sense that it *accepts them as true*, entering into contracts at those prices—contracts on which it stands to gain or lose money. Actuaries and their clients likewise trust present value tables and mortality · tables to enable them to calculate the true costs and risks on which a business or investment decision may depend. There is of course no *guarantee* of accuracy in such cases; a value may be miscalculated, misreported, misentered, or misprinted. But the user considers it highly likely that the information is accurate—likely enough that he *treats it as true*. In effect users *bet* on the accuracy of such a publication. Publishers, likewise, "stake their business or public reputations *on [its] accuracy*." (*Conoco Inc. v. Department of Energy, supra,* 99 F.3d 387, 393, italics added.)

As this case illustrates, however, one can use information and even rely upon it for some purposes without accepting or treating it as true. Here the police department used the site to obtain *"whatever information that's out there within the internet"* that a phone number *"might* be assigned to." (Italics added.) The site might only report "the closest hit," but might also report "several other numbers if there is anything else listed *or associated* with that number." (Italics added.) Detective Barry was not asked to, and did not, describe what exactly he had done to extract the information at issue, or indeed what form the information took. Nor was he asked to explain what use he made of it, or what use the department or other "businesses" had made of similar information in the past. He was not asked to, and did not, affirm that he relied on the site "as accurate." Indeed there was no evidence that the information contributed to his investigation of the case in any way. For all the record shows, the only use he ever made of the information retrieved from the site was to copy it into his police report and then repeat it in court. There was thus a complete failure of proof with respect to the use and reliance components of the cited exception.

Beyond that, however, we believe the use and reliance likely to be made of such information by a police department, or similar investigatory enterprise, is so far removed from the purpose and rationale of section 1340 that it simply cannot justify application of that statute in the circumstances suggested here. In contrast to the paradigmatic user of a published compilation, a police department does not gather information for its own commercial advantage. It gathers information, rather, in the performance of an official duty to investigate suspected criminal activity. Investigators typically deal as much in suspicions and possibilities as in established facts. The business of police detectives, in particular, is "solving" crimes by identifying "suspects" and either eliminating them from suspicion or gathering evidence to build a case against them. Due to the nature of this undertaking, *a detective may "use" and "rely on" information for investigative purposes even though he doubts its accuracy.*

 Respondent, to its credit, acknowledges this problem. It writes that the police department relied "on the website, at least to produce a *putative* name of a registered user." (Italics added.) It describes the information thus retrieved as *"tentative* proof" that gave "some *initial indication* to the detective as to the identity of the owner of the cell phone." (Italics added.)[10] Respondent goes on to insist that Detective Barry's mere retrieval of the information "provided the evidence of substantial reliance required by sections

---

[10] These characterizations are corroborated by Entersect's own home page, which describes it as "the nation's leading provider of *investigative data* for law enforcement and government agencies." (Entersect <https://www.entersect.net/marketing/media/entersect/index.html> [as of Nov. 6, 2012].)

1340 and 1270." But the statute requires more than "substantial reliance"; it requires actual reliance on the proffered information "as accurate." (§ 1340.) Such reliance cannot be found where the evidence shows only an investigator's retrieval of information that was "putative" or "tentative" in character. An officer's mere retrieval of such information from a Web site cannot transform it into proof worthy of presentation to a jury. "Putative" facts, "initial indication[s]," and "tentative proof" are not the stuff of which hearsay exceptions are or should be fashioned.

We conclude that the prosecution presented insufficient foundation for admission of this evidence over defendant's hearsay objection.

### D. *Prejudice*

Although the evidence from the Entersect site should not have been admitted on the meager foundation offered for it, we are unable to conclude that its admission was prejudicial to defendant. The only fact attributed to the Entersect site was that the second of two phones used to arrange the drug sale was defendant's. But Detective Barry also testified, without objection below or here, that when defendant was arrested she was in possession of this same phone. The question therefore turns on how likely it is that the jury's finding of guilt depended on evidence of defendant's ownership, as distinct from her mere possession, of the phone.

We note that defendant's possession of the phone was itself some evidence of ownership. Unless one has some reason to think otherwise, one generally supposes that a phone in another's possession is that person's phone. Here, however, there might have been some reason to question that supposition, because prior to the last phone conversation all of the detective's voice contacts over that phone connection had been with a male. This raised at least the possibility that defendant was only in temporary possession of the phone and that her only direct involvement in the transaction was to answer the detective's last call and say, "We are here," and "Where are you at?"

However, this involvement alone—regardless of who owned the phone—seems more than sufficient to establish defendant's guilt as an aider and abettor. As the jury was instructed, defendant was guilty on that theory if she "aid[ed], facilitate[ed], promote[d], encourage[d], or instigate[d] the perpetrator's commission of th[e] crime." "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 [29

Cal.Rptr.3d 423, 113 P.3d 100].) But while the defendant must "in fact assist[]" the primary actor to commit the offense, there is no requirement that his conduct be a but-for cause or even an essential factor in bringing it about. (See *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743 [7 Cal.Rptr.3d 744] ["The 'act' required for aiding and abetting liability need not be a substantial factor in the offense."].) By statute, one need only be "concerned" in a crime to be charged as an aider and abettor. (Pen. Code, § 31.) " ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." [Citation.]' " (*Swanson-Birabent, supra*, 114 Cal.App.4th at p. 743, quoting *People v. Durham* (1969) 70 Cal.2d 171, 185, fn. 11 [74 Cal.Rptr. 262, 449 P.2d 198].)

Here defendant's act of conversing with the detective in aid of the planned rendezvous constituted sufficient involvement in the sale to establish the actus reus of aiding and abetting. Ownership of the phone was, for these purposes, immaterial. Defendant would have been no less guilty if the conversation had taken place in a public phone booth which the detective had called by prearrangement. It is true that defendant's ownership of the phone might have suggested *additional* involvement on her part by, e.g., lending her phone to Umbertas, or perhaps authoring and receiving text messages, in earlier communications with Detective Barry. But these inferences seem weaker than the uncontested facts that she actually took a phone call from him which helped to bring about the rendezvous, and indeed participated in the rendezvous to the extent of inviting him to enter the car.

Of course for any of her involvement to constitute aiding and abetting, it also had to appear that defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) But we are unable to see how evidence of her ownership of the phone could have any bearing on that issue. It is true that in the absence of that evidence, she might not be associated with the earlier calls and texts. But that association had no logical tendency to establish that when she herself took a call from the detective, she knew her companion was involved in a criminal scheme. She could just as easily have lent him her phone for those prior contacts with no knowledge of his criminal purpose. The jury's finding of the requisite mens rea must necessarily have rested on other evidence and inferences—most obviously, her statement to Officer Buckleman anticipating a call from the upstream supplier of the drugs her companion sold. In short, we can see no basis to conclude that the Entersect testimony had any effect on the verdict.

## DISPOSITION

The judgment is affirmed.

Premo, J., and Márquez, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 13, 2013, S207403.