Filed 8/14/23  In re T.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re T.B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> T.B., <br><br> Defendant and Appellant. | F084909 <br><br> (Super. Ct. No. 20CEJ600257-2) <br><br> **OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Virna L. Santos, Judge.

William Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Smith, J. and DeSantos, J.

Minor T.B. was found to have committed first degree residential robbery. On appeal, he contends the evidence was insufficient to support this finding. We affirm.

## PROCEDURAL SUMMARY

On May 25, 2022, a juvenile petition was filed pursuant to Welfare and Institutions Code section 602 alleging minor committed first degree residential robbery (Pen. Code, § 211).[1]

On July 20, 2022, the juvenile court held a jurisdiction hearing. The prosecution proceeded on an aiding and abetting theory, and the court found the allegation true.

On August 17, 2022, at the disposition hearing, the juvenile court declared minor a ward of the court, found his maximum aggregated confinement time to be three years eight months, continued him on probation until September 3, 2023, and ordered him to spend 15 more days in the Juvenile Justice Center, in addition to the 125 days already spent, followed by no more than 60 days on GPS supervision with various terms and conditions.

On September 2, 2022, minor filed a notice of appeal.

## FACTS

On April 27, 2022, 10-year-old Micah and his mother were living in a first-floor apartment in a two-story apartment complex with outdoor stairways and common areas. Before his mother left for work that afternoon, Micah went to the laundry room, which was directly across from their apartment, and put his load of wet clothes into the dryer. While he was outside, three older boys—16-year-old minor, M., and X.—approached him and asked if he wanted to play football. Micah knew minor because he was the older brother of one of Micah's friends, and Micah knew X., but he did not know M. None of the three boys lived in Micah's apartment complex. Minor lived less than one-quarter mile away and only about a 50-second walk from Micah's apartment. M. and X. also

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

lived nearby but in the opposite direction. Micah felt weird about their invitation because all three boys were wearing jackets or hoodies, and M. and X. were both wearing makeshift ski masks tied over their faces, even though it was a hot day that felt like 90 degrees to Micah, who was wearing only shorts and a T-shirt. He told the boys he would think about it, but he really meant no, and he returned to his apartment.

In addition to Micah's observations from his apartment, video footage from a neighbor's surveillance camera captured the movement of the three boys.[2] After Micah went back into his apartment, the boys went to sit and smoke on the lower steps of the staircase leading up to the second-floor apartment above Micah's. Minor took off the backpack he was wearing and set it on a step. About 10 minutes later, a little before 4:00 p.m., Micah's mother left for work. She told Micah to stay inside with the door locked while she was gone, with the exception of getting his laundry from the dryer in the laundry room. Their apartment had been burglarized recently—by X. and possibly others—when Micah left the apartment to play football while his mother was at work, so she always directed him not to leave. As she walked out of the apartment, she walked past the three boys sitting on the steps.

Shortly after mother left, the three boys got up off the stairs. M. put on the backpack minor had taken off and they all walked toward the laundry room. Then, about one minute later, minor came to Micah's door and knocked. Minor was wearing a black puffer jacket and orange animal print shorts. When Micah opened the inner door, minor asked him through the screen door if he could come out and play football. Micah did not see the other two boys. Micah told minor he could not come out because his mom told him not to. Minor tried to convince him to come and play football, nearly begging him, but Micah told him he could not and closed the door. Minor continued to knock on both the door and the adjacent window about seven times, until he left and walked back into

---

[2]     The videos have no audio component.

3.

the laundry room. Then, about five minutes later, M. came from the laundry room to Micah's door and knocked. Micah opened the inner door again. M. asked Micah for money to take the bus home. He said he would give Micah some Pokemon cards. Micah said no. Because M. was wearing a mask, Micah believed M. would rob him if he opened the door. Micah closed the door, but M. continued knocking for a few minutes, saying, " 'I know you're in there.' " Then M. left and walked back into the laundry room. But he came back, knocked some more, then went to the adjacent window and kicked it in with his foot. He climbed in through the broken window, followed by X. Once inside, M. held Micah by the shoulders and took him around the house. Micah was scared. M. took him into his mother's room, where M. took her purse, laptop, and medicine that were on the bed. Micah's silver dog tag necklace was inside the purse. X. was in the living room and kitchen, and Micah did not know where minor was at this point. Micah could not see the rest of the apartment from his mother's room, so he did not know if minor came into the apartment.

M. left the apartment before X. and was met by minor outside the door. They stood face to face. Hanging from M.'s hand was a necklace, and minor bent down and grabbed it from him. After a few seconds, M. and minor walked away and, about 30 seconds later, X. came running out of the apartment. Micah moved closer to the door and window and saw M. and X. return to the laundry room. After a few minutes, they ran from the laundry room in the direction of X.'s residence. Micah did not see minor.

Micah called his mother, but she was working and did not answer until he had called many times. He told her what had happened, and she left work immediately and called 911 as she drove home. When she arrived in the apartment, Micah was sitting on the bed, shaking, with a knife in his hand. He said it was just in case they came back. The apartment was a mess and broken glass was everywhere. Mother noticed that her purse, laptop, and medications were gone.

Within only minutes of mother's call reporting the home invasion robbery, the police also received a call reporting a stabbing. Officers were dispatched to Micah's apartment complex and to another apartment complex nearby.

When officers arrived at Micah's apartment, they found mother's purse and laptop in the laundry room, but the other possessions were gone. Micah's wet clothes had been removed from the dryer and dropped behind it. An officer lifted a fingerprint from the dryer that was later identified as minor's.

Meanwhile, an officer responded to the stabbing at the nearby apartment complex. Minor was there with "an adult involved in this case." Minor was still wearing the black puffer jacket and orange animal print shorts, but now he was also wearing a dog tag necklace, as captured by the responding officer's body camera. When Micah was shown a still photograph from that video, he testified the necklace looked exactly like his.[3]

When officers later searched minor's bedroom in his apartment, they found mother's medication on a bunk bed, along with a black puffer jacket and orange animal print shorts identical to those worn by minor on the day of the robbery.

## DISCUSSION

Minor contends there was insufficient evidence he aided and abetted the robbery because there was no evidence he participated in it or was even present on the scene when M. and X. entered the apartment. He argues that although he did attempt to lure Micah out of the apartment, when that failed, he left and was gone by the time M. approached Micah's door. He states that "[his] involvement in the crime, as far as anyone (including Micah) could ascertain, came to an end when his attempt to lure Micah out of the residence failed." Minor claims there was no evidence to support an inference

---

[3] Further evidence of the alleged stabbing investigation was not presented in this case. Also not presented was evidence of why minor was there and with whom. The evidence was presented to establish minor's appearance a short time after the crime.

that he was even aware of M.'s forcible entry into the apartment or of any criminal intent to commit a robbery rather than a theft.[4]

We conclude minor's contentions are not supported by the record, and the evidence was more than sufficient to support the finding minor aided and abetted the robbery.

## I. Law

"The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials …." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1518.) Under the substantial evidence standard, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the [minor] guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v.*

---

[4] Minor concedes that if he had remained present, his actions might have supported the necessary inferences to find him guilty of aiding and abetting, but he asserts he was not present.

*Maury* (2003) 30 Cal.4th 342, 403.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the [trier of fact's] verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence. [Citation.]' [Citation.] … '[I]t is the [trier of fact], not the appellate court that must be convinced of the [minor's] guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) A person may be convicted of robbery if he was the perpetrator of the robbery or, alternatively, if he aided and abetted the commission of the robbery. (§ 31 ["All persons concerned in the commission of a crime, … whether they directly commit the act constituting the offense, or aid and abet in its commission, … are principals in any crime so committed."]; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117 ["a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts"].) " '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime.' " (*People v. Johnson* (2016) 62 Cal.4th 600, 630.)

7.

" 'The "act" required for aiding and abetting liability need not be a substantial factor in the offense.' " (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216 [" ' " '[l]iability attaches to anyone "concerned," however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal' " ' "].) " 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1147–1148.) " 'Among the factors which may be considered in making the determination of aiding and abetting are[ ] presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*Nguyen*, at p. 1054; see *People v. Johnson* (2019) 32 Cal.App.5th 26, 60; *People v. Lara* (2017) 9 Cal.App.5th 296, 322 [presence at the scene, companionship, and flight are factors]; *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743– 744 [lookouts, getaway drivers, and persons present to divert suspicion are principals].) " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*Nguyen*, at p. 1055.)

## II.    Analysis

In this case, we have thoroughly reviewed the evidence, including the video and photographic evidence, and we conclude the record and the rational inferences arising from it amply supported the conclusions that the three boys planned and intended to steal from Micah, and that the plan likely began as a plan to burglarize Micah's apartment and evolved into a plan to forcibly enter the apartment and rob Micah.

First, none of the three boys lived in Micah's apartment complex and the evidence suggested they had no reason to be there other than to commit this crime. In fact, X. had recently burglarized Micah's apartment when Micah came out to play football while his mother was at work. Second, the boys came dressed for thievery, all wearing jackets that were inappropriate for the hot weather but good for hiding stolen property, as was the

backpack.  M. and X. wore masks tied over their faces to hide their identities.  Minor, on the other hand, wore no mask because his intended role in luring Micah out to play required that he be a familiar and friendly face.  Third, the boys' attempts to lure Micah out of the apartment supported the inference that they originally planned to repeat X.'s prior crime by removing Micah from the apartment and distracting him during the burglary.  Before mother left, minor attempted to get Micah to agree to a football game.  After planting that suggestion, the three boys waited for mother to leave for work, sitting together on the stairs until Micah was alone in the apartment.  Then they took action.  M. put on the backpack, supporting the inference that the plan was for him, not minor, to enter the apartment.  They all moved into the laundry room as a home base, where they had cover and could meet to discuss the plan as it evolved.  Then minor approached the apartment and attempted to convince Micah to come out, pleading with him to come and play football.  When minor's entreaties and incessant knocking failed to persuade Micah to come out, minor gave up and returned to the laundry room.  Fourth, the evidence supported the inference that the boys did not abandon their plan, but instead determined their luring was not working and they would need to gain entry by force.  This time, M. went to the door and tried to convince Micah to open the door for some Pokemon cards, supporting the inference that M. intended to force his way inside once Micah opened the door.  But Micah suspected exactly that, believing that M., a stranger wearing a mask, would rob him if he opened the door, so he refused.  When Micah could not be tricked into opening his door, M. returned to the laundry room to regroup.  He came back to the door, knocked again, then broke the window and entered, followed by X.

Minor insists there was no evidence he ever entered the apartment or was even present after his attempts to lure Micah out had failed.  Minor argues he abandoned the failed plan, left the scene, knew nothing of the home invasion, and received the stolen property at some later time after M. and X. had reached a place of safety and the robbery was complete.  In reply to the People's response that a video showed minor was indeed

9.

present after the robbery, minor concedes the video showed his presence but nothing more incriminating. Contrary to minor's claims, however, the video established more than his mere presence. It established minor was present outside the apartment door when M. exited with stolen property. When M. came out, he had already removed Micah's necklace from the purse and it was hanging from his hand. He and minor stood face to face, presumably talking, and then minor bent down and took the necklace from M.'s hand before either of them started to walk away from the apartment. Overall, the evidence established minor was present throughout the incident and did not leave the scene until he had received the stolen property. Further, the evidence supported the inferences that minor was aware of the evolving plan, functioned outside as a lookout during the robbery, and was waiting for his share of the spoils. A very short time later, he was wearing Micah's stolen necklace—already displaying the fruits of the crime. When a search was later executed, mother's stolen medication was found in minor's bedroom, along with his black puffer jacket and orange animal print shorts. Together, the evidence was more than sufficient to prove minor aided and abetted M. and X. in their robbery of Micah.

Lastly, we need not determine the merits of minor's contention that the evidence found during the search of his bedroom should have been excluded on the ground that the search was not based on personal knowledge that the apartment and bedroom were minor's. Even without the evidence found during the search, the remaining evidence was sufficient to prove minor aided and abetted the robbery.

### DISPOSITION

The juvenile court's findings and orders are affirmed.