Jones, P. J.
*932 In 2011, law enforcement officers searched the home of Lanita Denise Davis and Darrell James Mooring, (Mooring, Sr.) and found over 4,000 prescription pills, many of which were in prescription pill bottles. Davis and Mooring Sr.'s names were on some pill bottle labels; other labels bore the name of their son, Darrell Ellis Mooring Jr. (Darrell). Using Ident-A-Drug, a subscription-based, login-controlled Web site, the prosecution's criminalist presumptively identified the pills as various controlled substances.
A jury convicted Davis and Darrell (collectively, defendants) of five counts of possessing a controlled substance for sale ( Health & Saf. Code, § 11351 (dihydrocodeinone/Vicodin, codeine, morphine, methadone, and oxycodone))[1] and one count of possessing a designated controlled substance for sale (§ 11375, subd. (b)(1) (diazepam)). The court placed Davis on probation, with the condition she spend two years in jail. The trial court found Darrell's prior convictions true, denied his motion to strike those convictions ( People v. Superior Court (Romero ) (1996) 13 Cal.4th 497, 53 Cal.Rptr.2d 789, 917 P.2d 628 ( Romero )), and sentenced him to 10 years in state prison.
Defendants appeal, and join each other's briefs. They contend: (1) the court erred by admitting statements Davis made to police in 2003; (2) the criminalist's testimony regarding the content of the Ident-A-Drug Web site was inadmissible hearsay, and its admission violated state hearsay law and their confrontation rights under the Sixth Amendment to the federal constitution; and (3) the prosecution failed to prove they possessed the controlled substances. Darrell claims the court erred by imposing an enhancement for a prior drug-related conviction (§ 11370.2, subd. (a)), and by denying his Romero motion.
We conclude the Ident-A-Drug Web site comes within the published compilation exception to the hearsay rule set forth in Evidence Code section 1340, and that defendants' confrontation clause claim fails *620 because the challenged hearsay is not testimonial. We agree with defendants that the prosecution did not establish dihydrocodeinone/Vicodin is a controlled substance under sections 11055 or 11056 and, as a result, defendants' conviction for possessing a controlled substance for sale ( § 11351 (Count One)) must be reversed and the cause remanded for resentencing. In all other respects, we affirm. *933 FACTUAL AND PROCEDURAL BACKGROUND
An indictment charged defendants with possessing dihydrocodeinone, a controlled substance, for sale ( § 11351 (Count One)); possessing diazepam, a designated controlled substance, for sale (§ 11375, subd. (b)(1) (Count Two)); possessing codeine, a controlled substance, for sale ( § 11351 (Count Three)); possessing morphine, a controlled substance, for sale ( § 11351 (Count Four)); possessing methadone, a controlled substance, for sale ( § 11351 (Count Five)); and possessing oxycodone, a controlled substance, for sale ( § 11351 (Count Six)). The indictment alleged sentencing enhancements for Darrell's two prior drug-related convictions (§ 11370.2, subd. (a)), and his prior serious felony conviction ( Pen. Code, §§ 667, subds. (b) - (i), 1170.12 ).
Prosecution Evidence
In January 2011, Richmond Police Sergeant Eduardo Soto was assigned to the narcotics unit. He had significant experience investigating suspected narcotics sales. As Soto was preparing to execute a search warrant at Davis and Mooring Sr.'s house, he saw a woman park her car outside the house. She went inside the house for a minute, came back outside, and drove away. Later, another person parked outside the house, went inside, came out about a minute later, and left. Soto believed narcotics were being sold in the house.
Law enforcement officers knocked on the front door of the house and Mooring, Sr. answered. Inside the house, officers found mail belonging to "Darrell Mooring" and Davis. They also found over 4,000 prescription pills. Some pills were in prescription pill bottles with labels bearing the names "Lanita Davis," "Darrell Mooring," "Darrell Mooring, Sr." and "Darrell Mooring, Jr."[2] Other pill bottles had no label. In the master bedroom, officers found between 35 and 40 prescription pill bottles. Some bottles contained pills; others were empty. Officers also found a police scanner.
Darrell arrived while the officers searched the house. The officers gave Darrell a property receipt for the seized items. Later that day, Darrell came to the police station and asked for "his pills ... that [had been] taken" from the residence. When the police officer refused to return the pills, Darrell became angry.
A. Expert Testimony
Shana Meldrum, a criminalist at the Contra Costa Sheriff's Crime Lab (crime lab) testified as an expert in presumptive identification of prescription *934 pills. She had 10 years of experience as a criminalist, and over 400 hours of training in analyzing and identifying suspected controlled substances. Meldrum received training on the references the crime lab uses to presumptively identify prescription pills. The crime lab uses a reference-the Ident-A-Drug *621 Web site-to presumptively identify pharmaceutical pills. The Web site contains information about, and images of, pharmaceutical pills derived from the FDA and pharmaceutical pill manufacturers.[3] The crime lab pays a subscription fee to access Ident-A-Drug, and the Web site is login-controlled.
To presumptively identify a prescription pill, the crime lab compares the pill's "individual characteristics"-its color, shape, and markings-to images on Ident-A-Drug. Meldrum explained: "I type the markings on the pill into the website and it gives me either one match or a list of possible matches that the pill may be. And based on the color and the shape and the imprints on the pill, I make a determination as to whether or not to report that out as a presumptive identification." This method is generally accepted in the scientific community, and has been reviewed by the crime lab's accrediting board.[4] Meldrum has presumptively identified prescription pills using Ident-A-Drug over 2,000 times.
Meldrum compared the markings, imprints, coloring, and shapes of the prescription pills seized from the residence to the information on Ident-A-Drug. Meldrum presumptively identified the pills as follows: (1) 1,930 dihydrocodeinone (or Vicodin ), a controlled substance;[5] (2) 573 oxycodone, a controlled substance; (3) 132 diazepam, a controlled substance; (4) 785 methadone, a controlled substance; (5) 242 morphine, a controlled substance; and (6) 113 codeine, a controlled substance. Meldrum did not conduct chemical testing on the pills. A usable amount of a prescription pill "may be as ... little as half a pill." Meldrum did not think the pills were counterfeit. Counterfeit pills are "a softer texture than a legal pharmaceutical" and may have a "slightly different color."
Richmond Police Sergeant Tim Simmons testified as an expert on possessing prescription pills for sale. Simmons reviewed defendants' prescription records from 2009 to 2011, which showed they obtained the "maximum allowable" number of certain opiate-based drugs and muscle relaxers every month. Some prescriptions were billed to an insurance carrier; others were paid for in cash. Simmons opined defendants possessed the pills for sale *935 based on: (1) the quantities for each individual drug, which were beyond what defendants could have safely ingested; (2) the frequency with which defendants filled prescriptions; (3) irregularities in the billing and payment for the prescriptions; and (4) the police scanner found in the house.
B. The 2003 Incident at Davis's Home
In 2003, Richmond Police Detective Darren Monahan executed a search warrant at Davis's house. Davis was handcuffed. In a bedroom, Monahan found a large amount of cash and prescription pill bottles containing 134 pills. The names on the prescription labels did not match the names of anyone in the house. When Monahan asked Davis "who the prescription pills belonged to," she responded "they belonged to her." Monahan Mirandized Davis and asked her why she had the prescription pills. Davis said "she gets them from various people and then resells *622 them for extra money." No charges were filed against Davis based on the 2003 incident.
With regard to the evidence of the 2003 incident, the court admonished the jury: "with respect to any statement allegedly made by Ms. Davis, if, in fact, it is believed by you, it is solely to be used in evaluating whether or not Ms. Davis is guilty or not guilty of the charges. It is not to be used in any way in evaluating whether or not [Darrell] is guilty or not guilty of the charges."
Defense Evidence
In 2010 and 2011, Dr. Nishant Shah prescribed methadone to Mooring, Sr. Darrell was a patient of Dr. Edward Manougian from 2008 to 2011. In 2009 and 2010, Darrell had chronic pain syndrome. Dr. Manougian prescribed Darrell up to 800 pills a month, comprised of Vicodin, OxyContin, a muscle relaxant, and Valium. During that same time period, Dr. Manougian also treated Davis for "chronic pain." In January 2011, he prescribed Davis hundreds of prescription pills, including oxycodone, Valium, and a Vicodin-like drug. Dr. Manougian believed defendants were using the prescribed pills, not selling them. In 2007, certain pharmacies stopped filling Dr. Manougian's prescriptions. In 2012, Dr. Manougian's medical license was revoked in part because he had "not engaged in any formal course of study" regarding "treatment of pain or pain management" and had no "special training or experience in addiction."
Verdict and Sentencing
The jury convicted defendants of the charges. The court placed Davis on five years' probation, with the condition she serve a one-year jail terml. The *936 court found true the allegations regarding Darrell's prior convictions and denied his Romero motion. The court sentenced him to 10 years in state prison, comprised of the following: four years on Count One ( § 11351 ); and two three-year enhancements (§ 11370.2, subd. (a)).
DISCUSSION
I.**
II.
Admitting the Criminalist's Testimony Did Not Violate State Hearsay Law or the Confrontation Clause
Relying on People v. Sanchez (2016) 63 Cal.4th 665, 204 Cal.Rptr.3d 102, 374 P.3d 320 ( Sanchez ), defendants contend Meldrum's testimony regarding the Ident-A-Drug Web site was inadmissible hearsay and that its admission violated their confrontation rights under the Sixth Amendment to the federal Constitution.[9] In Sanchez , the court considered the extent to which Crawford "limits an expert witness from relating case-specific hearsay in explaining the basis for an opinion, and it clarified the application of the state hearsay rules to that kind of expert testimony." ( People v. Meraz (2016) 6 Cal.App.5th 1162, 1170, review granted Mar. 22, 2017, S239442.) Sanchez held "case-specific out-of-court statements conveyed by the prosecution's gang expert constituted inadmissible hearsay under state law and, to the extent they were testimonial, ran afoul of Crawford ." ( Ibid. ; Sanchez, supra, 63 Cal.4th at p. 686, 204 Cal.Rptr.3d 102, 374 P.3d 320, fn. omitted.)
*623 Under Sanchez , "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the Crawford limitations of unavailability, as well as cross-examination or *937 forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is testimonial hearsay ." ( Sanchez, supra, 63 Cal.4th at p. 680, 204 Cal.Rptr.3d 102, 374 P.3d 320.)
A. The Ident-A-Drug Web Site Comes Within the "Published Compilation" Exception to the Hearsay Rule
Defendants contend Meldrum's testimony relating the content of the Ident-A-Drug Web site was hearsay offered to prove its truth, i.e., that the pills were certain pharmaceuticals. The Attorney General argues Meldrum's testimony fell within the "published compilation" exception to the hearsay rule, codified in Evidence Code section 1340. We agree.
Evidence Code section 1340 provides: "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business as defined in [Evidence Code] Section 1270." ( Evid. Code, § 1340.) Examples of "published compilations" include a spray paint can label including hazardous substances ( In re Michael G. (1993) 19 Cal.App.4th 1674, 1678, 24 Cal.Rptr.2d 260 ); survey results measuring magazine advertising ( People ex rel. Lockyer v. R.J. Reynolds Tobacco Co. (2004) 116 Cal.App.4th 1253, 1258, 1275-1276, 11 Cal.Rptr.3d 317 ( R.J. Reynolds Tobacco )); a traffic safety database maintained by the National Highway Traffic Safety Administration ( Collins v. Navistar, Inc . (2013) 214 Cal.App.4th 1486, 1516, 155 Cal.Rptr.3d 137 ( Collins )); and mortality tables showing life expectancy ( Christiansen v. Hollings (1941) 44 Cal.App.2d 332, 339-340, 112 P.2d 723 ; see generally Simons, supra, § 2:94, pp. 187-188.)
The elements of the published compilation exception are: "(1) the proffered statement must be contained in a 'compilation'; (2) the compilation must be 'published'; (3) the compilation must be 'generally used ... in the course of a business'; (4) it must be 'generally ... relied upon as accurate' in the course of such business; and (5) the statement must be one of fact rather than opinion." ( People v. Franzen (2012) 210 Cal.App.4th 1193, 1206, 148 Cal.Rptr.3d 863, fn. omitted ( Franzen ).) These elements are satisfied here.
First, Ident-A-Drug is a compilation. To compile means " '[t]o collect and put together (materials), so as to form a treatise; to collect into a volume,' and '[t]o make, compose, or construct (a written or printed work) by arrangement of materials collected from various sources.' " ( Franzen, supra, 210 Cal.App.4th at p. 1210, 148 Cal.Rptr.3d 863 ; see also Merriam-Webster's 11th Collegiate Dict. (2014) p. 253 [defining "compile" as "to compose out of materials from other documents," or "to collect and edit into a volume"].) "The history, language, *938 and rationale of [Evidence Code] section 1340 suggest that the exception contemplates an organized, edited presentation of a finite quantity of information that, if not printed on paper, has been recorded and circulated in some fixed form analogous to printing." ( Franzen, at p. 1209, 148 Cal.Rptr.3d 863.) The Ident-A-Drug Web site collects information regarding *624 prescription pills from the FDA and pharmaceutical pill manufacturers and presents the information in a searchable database. It is an "organized, edited presentation of a finite quantity of information that ... has been recorded and circulated in [a] fixed form analogous to printing." ( Franzen, at p. 1209, 148 Cal.Rptr.3d 863 ; Miller v. Modern Business Center (1983) 147 Cal.App.3d 632, 635, 195 Cal.Rptr. 279 [page from research corporation's book was a "compilation" under Evidence Code section 1340 ].) Defendants' argument to the contrary is not persuasive.
Second, the compilation is "published" on the Internet. ( Franzen, supra, 210 Cal.App.4th at p. 1210, 148 Cal.Rptr.3d 863 [published means "made public by printing, or an equivalent process" and noting electronically stored data may, in certain circumstances, be treated as a published compilation]; see also Moreno v. Hanford Sentinel, Inc. (2009) 172 Cal.App.4th 1125, 1130, 91 Cal.Rptr.3d 858 [plaintiff "published" the information by posting it on a Web site].) Third, the compilation is "generally used" in the crime lab's course of business. Meldrum testified she used Ident-A-Drug over 2,000 times to presumptively identify prescription pills, and that the use of the Ident-A-Drug Web site is generally accepted in the scientific community. (See Collins, supra, 214 Cal.App.4th at p. 1516, 155 Cal.Rptr.3d 137 [expert testified "databases were ... commonly used and relied upon by traffic safety experts and statisticians"].)
Lastly, the Ident-A-Drug Web site is "generally ... relied upon as accurate" by the crime lab in conducting its business. ( Evid. Code, § 1340.) Meldrum's testimony that she used Ident-A-Drug over 2,000 times to presumptively identify prescription pills supports an inference the crime lab relies on the Web site's accuracy. Meldrum also testified the use of Ident-A-Dent to presumptively identify prescription drugs is generally accepted in the scientific community. Furthermore, Ident-A-Drug has a commercial incentive to be accurate and reliable because subscribers pay to access the Web site. Here, "[t]rustworthiness is reasonably assured by the fact that the business community generally uses and relies upon the compilation and by the fact that its author knows the work will have no commercial value unless it is accurate." ( Miller v. Modern Business Center, supra, 147 Cal.App.3d at p. 635, 195 Cal.Rptr. 279 ; In re Michael G., supra, 19 Cal.App.4th at p. 1678, 24 Cal.Rptr.2d 260 [public relies on accuracy of label including hazardous substance]; R.J. Reynolds Tobacco, supra, 116 Cal.App.4th at pp. 1278-1279, 11 Cal.Rptr.3d 317 [survey results were "relied on as accurate in the course of business"].)
*939 Relying on Franzen , defendants contend Ident-A-Drug is not a published compilation under Evidence Code section 1340. In Franzen , a law enforcement officer received a telephone call and wanted to match the phone number to the caller. The officer " 'ran that phone number in "Entersect", an online database, and the database listed that cell phone number as belonging to' " the defendant. ( Franzen, supra, 210 Cal.App.4th at p. 1204, 148 Cal.Rptr.3d 863.) The appellate court determined the database from which the officer "extracted the evidence" bore "virtually no resemblance to a 'published compilation' " in Evidence Code section 1340 and held the "mere retrieval of [ ] information from a website cannot transform it into proof worthy of presentation to a jury." ( Franzen, at pp. 1210, 1215, 148 Cal.Rptr.3d 863.)
Franzen explained: "apart from consisting of a collection of information, [the database] has none of the characteristics of a 'compilation' in the modern sense. [¶] To treat a database as a published compilation *625 merely because it is accessible through a website would dramatically undermine the delicate balance of competing policies reflected in the hearsay rule, its exceptions, and the particular exception here. ... [T]he Internet, provides ready access to information of all shades and degrees of accuracy, from the indisputably true to the inarguably false. Of particular concern in a setting like the present one is the persistence in the digital universe of outdated information. A person's real-world link with a telephone number may be broken when she moves or changes carriers. ... We suspect that methods exist for weeding out such obsolete data and thus increasing the accuracy of the data retrieved, but there was no evidence to this effect here. On the contrary, the evidence was that the site reported 'whatever information that's out there within the internet that [a phone number] might be assigned to.' " ( Franzen, supra, 210 Cal.App.4th at pp. 1210-1212, 148 Cal.Rptr.3d 863, fns. omitted.)
In our view, Franzen is easily distinguishable. There, the information in the database was available to anyone with an Internet connection and the source of the information was unknown and potentially inaccurate. ( Franzen, supra, 210 Cal.App.4th at pp. 1209, 1211, 148 Cal.Rptr.3d 863.) Here, Ident-A-Drug is a subscription-based and login-controlled Web site, and the information on the Web site comes from the FDA and prescription pill manufacturers. Ident-A-Drug does not, as in Franzen , report " 'whatever information that's out there within the internet.' " ( Id. at p. 1212, 148 Cal.Rptr.3d 863.) Instead, the Web site reports a finite amount of information from a governmental agency and from the manufacturers of the prescription drugs listed. The concerns articulated in Franzen -that an Internet database may contain outdated or inaccurate information-are not present here.
In Franzen , there was "a complete failure of proof with respect to the use and reliance components of the cited exception." ( *940 Franzen, supra , 210 Cal.App.4th at p. 1214, 148 Cal.Rptr.3d 863.) The officer was not "asked to explain what use he made of it, or what use the department or other 'businesses' had made of similar information in the past. He was not asked to, and did not, affirm that he relied on the site 'as accurate.' Indeed there was no evidence that the information contributed to his investigation of the case in any way. For all the record shows, the only use he ever made of the information retrieved from the site was to copy it into his police report and then repeat it in court." ( Ibid. ) Here, there was no "failure of proof"-Meldrum testified regarding her training on, and use of, the Web site. She also testified that using Ident-A-Drug to presumptively identify prescription pills was generally accepted in the scientific community. Finally, and in contrast to the police officer in Franzen , Meldrum relied on the information on the Web site to presumptively identify the pills.
Defendants' reliance on People v. Stamps (2016) 3 Cal.App.5th 988, 207 Cal.Rptr.3d 828 ( Stamps ) is unavailing. In that case, a criminalist presumptively identified prescription pills using Ident-A-Drug, but did not explain the Web site in any detail, nor testify that any special expertise was required to use it. ( Id . at pp. 991, 992, fn. 2, 207 Cal.Rptr.3d 828.) On appeal, the Attorney General conceded the content of the Ident-A-Drug Web site was hearsay and "proposed no hearsay exception." ( Id. at pp. 996, 997 & fn. 7, 207 Cal.Rptr.3d 828.) In a footnote, a division of this court expressed concern regarding the reliability of Internet Web sites but took "no position" on whether the Ident-A-Drug content fell within the published compilation exception to the hearsay rule. ( Id . at p. 997, fn. 7, 207 Cal.Rptr.3d 828.)
*626 Stamps does not assist defendants, because it did not consider whether a published drug reference guide accessible through a subscription Internet service is a published compilation within the meaning of Evidence Code section 1340. "It is axiomatic that an opinion does not stand for a proposition the court did not consider." ( People v. Taylor (2010) 48 Cal.4th 574, 626, 108 Cal.Rptr.3d 87, 229 P.3d 12.)
Nor are we persuaded by defendants' reliance on cases from other jurisdictions, including People v. Hard (Colo.Ct.App. 2014) 342 P.3d 572 ( Hard ). In Hard , a state trooper found pills in the defendant's pants pocket and "accessed the website Drugs.com to identify" them. ( Id. at p. 575.) On appeal, the defendant argued the state trooper's testimony regarding Drugs.com was inadmissible hearsay, and the Colorado Court of Appeals agreed. ( Ibid. ) It determined Drugs.com was not a market report or commercial publication within the meaning of Colorado Rules of Evidence 803(17), which codifies an exception to the hearsay rule for " 'Market quotations, tabulations, lists, directories or other published compilations, generally used and relied upon by the public or persons in particular occupations.' " ( Hard, at p. 576.) In reaching this conclusion, Hard considered the "necessity and reliability" of the Web site. ( Id. at p. 577.)
*941 First, the Hard court noted the prosecution did not argue "using Drugs.com [was] a necessary means of identifying drugs." Next, the court concluded the prosecution failed to establish the information on the Web site was "sufficiently reliable for the purpose of identifying a controlled substance." ( Hard, supra, 342 P.3d at p. 577.) Hard determined the testimony that Drugs.com was " 'nationally recognized' " and relied on to identify pills lacked foundation and failed to establish the Web site's reliability. ( Id. at pp. 577-578.) Additionally, Hard noted the prosecution provided no support for the argument that "Drugs.com is reliable because that website compiles and publishes material from reliable sources." ( Id. at p. 578.)
Hard has no application here. In Hard , the prosecution failed to prove the Web site was necessary or reliable. Meldrum's testimony established the necessity, reliability, and trustworthiness of the information on the Ident-A-Drug Web site. We conclude the Ident-A-Drug Web site comes within the published compilation exception to the hearsay rule codified in Evidence Code section 1340.
B. There Was No Confrontation Clause Violation Because the Challenged Hearsay Is Not Testimonial
The second prong of the Sanchez analysis asks: "If an out-of-court statement is hearsay because it is being offered for the truth of the facts it asserts, is that statement testimonial hearsay?" ( Sanchez, supra, 63 Cal.4th at p. 687, 204 Cal.Rptr.3d 102, 374 P.3d 320 ; see also People v. Ochoa (2017) 7 Cal.App.5th 575, 583, 212 Cal.Rptr.3d 703.) In Sanchez , our high court "surveyed the substantial body of case law regarding the proper formulation of 'testimonial' and summarized the concept as follows: 'Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial.' [Citation.] Also, in order to be considered testimonial, 'the statement must be made with some degree of formality or solemnity.' " ( Ochoa, at p. 583, 212 Cal.Rptr.3d 703.)
Examples of testimonial statements include " 'ex parte in-court testimony *627 or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " ( Crawford v. Wa s hington (2004) 541 U.S. 36, 51-52, 124 S.Ct. 1354, 158 L.Ed.2d 177.) *942 Here the challenged hearsay is not testimonial. As described above, Ident-A-Drug contains generic data about pharmaceutical pills, based on information provided from pharmaceutical manufacturers and the FDA. The primary purpose of collecting and compiling this content on the Ident-A-Drug Web site was not to gather or preserve evidence for a criminal prosecution. (See People v. Dungo (2012) 55 Cal.4th 608, 621, 147 Cal.Rptr.3d 527, 286 P.3d 442 ; see also Stamps, supra, 3 Cal.App.5th at p. 995, fn. 5, 207 Cal.Rptr.3d 828 [content of Ident-A-Drug Web site was not testimonial].)[10] Additionally, and as defendants seem to concede, the information on Ident-A-Drug does not have the requisite level of formality or solemnity to constitute testimonial hearsay. (See, e.g., People v. Holmes (2012) 212 Cal.App.4th 431, 438, 150 Cal.Rptr.3d 914 ["[u]nsworn statements that 'merely record objective facts' are not sufficiently formal to be testimonial"].)
Defendants' reliance on Melendez-Diaz, supra, 557 U.S. 305, 129 S.Ct. 2527 and Bullcoming v. New Mexico (2011) 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 ( Bullcoming ), does not alter our conclusion. In Melendez-Diaz , crime lab analysts prepared documents certifying that a sample of material recovered from the defendant was tested and determined to contain an illegal drug. The certificates were sworn to before a notary public, as required by state law, and admitted at trial in lieu of the analysts' testimony. ( Melendez-Diaz , at pp. 308-309, 129 S.Ct. 2527.) The United States Supreme Court determined the certificates were "affidavits" and that under Crawford , the "affidavits were testimonial." ( Id. at pp. 310, 311, 129 S.Ct. 2527.)
In Bullcoming , an analyst tested the blood sample of an alleged drunk driver and prepared a lab report attesting he performed the test using normal protocol. The analyst signed the report, which was admitted into evidence through a surrogate analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the] blood sample." ( Bullcoming, supra, 564 U.S. at p. 651, 131 S.Ct. 2705.) The United States Supreme Court concluded the report was testimonial and explained that even though the report was not a formal affidavit, as in Melendez-Diaz , it was a sufficiently formal and official document "created solely for an 'evidentiary purpose,' ... made in aid of a *628 police investigation, [and so] ranks as testimonial." ( Id. at p. 664, 131 S.Ct. 2705.) *943 Here, Meldrum testified about the presumptive identification she conducted, and defense counsel cross-examined her. Meldrum prepared a report of the results, but the report was not introduced into evidence. Meldrum's testimony bears no resemblance to the certified documents in Melendez-Diaz , nor to the lab report in Bullcoming . We conclude there was no confrontation clause violation. Having reached this result, we need not address the parties' arguments regarding prejudice.
III.
With the Exception of Count One, the Prosecution Established Defendants Possessed Controlled Substances
Defendants argue the prosecution did not prove beyond a reasonable doubt the pills were controlled substances.
A. Chemical Testing Was Not Necessary to Establish Defendants Possessed Controlled Substances
First, defendants contend insufficient evidence supports the convictions because the pills were not chemically tested. Sections 11351 and 11375 prohibit possession of a controlled substance for sale. To establish a violation of these statutes, "the prosecution must prove beyond a reasonable doubt that (1) the defendant exercised dominion and control over the controlled substance, (2) the defendant was aware that he or she was in possession of a controlled substance, (3) the defendant was aware of the nature of a controlled substance, (4) the controlled substance was in an amount sufficient to be used for sale or consumption as a controlled substance, and (5) the defendant possessed a controlled substance with the specific intent to sell it." ( People v. Parra (1999) 70 Cal.App.4th 222, 225-226, 82 Cal.Rptr.2d 541 ; see also CALCRIM No. 2302.) " 'In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " ( People v. Davis (2013) 57 Cal.4th 353, 357, 159 Cal.Rptr.3d 405, 303 P.3d 1179 ( Davis ).)
As defendants acknowledge, chemical analysis is not always required to establish the identity of a controlled substance. The essential elements of possession of a controlled substance " 'may be established circumstantially.' " (See People v. Palaschak (1995) 9 Cal.4th 1236, 1242, 40 Cal.Rptr.2d 722, 893 P.2d 717.) Chemical test results are routinely introduced at trial to establish the illegal nature of a controlled substance, but they are not required. "[T]he nature of a substance, like any other fact in a criminal case, may be proved by circumstantial evidence. [Citations.] It may be proved, for *944 example, by evidence that the substance was a part of a larger quantity which was chemically analyzed [citations], by the expert opinion of the arresting officer [citation], and by the conduct of the defendant indicating consciousness of guilt." ( People v. Sonleitner (1986) 183 Cal.App.3d 364, 369, 228 Cal.Rptr. 96 ; see also Davis , supra, 57 Cal.4th at p. 357, 159 Cal.Rptr.3d 405, 303 P.3d 1179 [citing cases where expert testimony on MDMA's "chemical composition" or its "effects on the user" were used to establish possession of a controlled substance]; People v. Marinos (1968) 260 Cal.App.2d 735, 738, 67 Cal.Rptr. 452 [affirming marijuana possession conviction premised on the arresting officer's testimony].)
Here, Meldrum presumptively identified the prescription pills and testified she did not believe the pills were counterfeit. Dr. Manougian prescribed defendants numerous prescription pills including Vicodin, OxyContin, and Valium.
*629 Thousands of pills-some of which were in prescription pill bottles with labels bearing defendants' names-were found in the residence. In light of this evidence, chemical testimony was not necessary to prove defendants possessed the controlled substances.[11]
People v. McChristian (1966) 245 Cal.App.2d 891, 54 Cal.Rptr. 324 is distinguishable. There, a police officer saw balloons inside of the defendant's mouth; believing they contained heroin, the officer unsuccessfully tried to recover the balloons as the defendant fled. ( Id. at pp. 894-895, 54 Cal.Rptr. 324.) The balloons were never recovered or entered into evidence. ( Id. at pp. 896-897, 54 Cal.Rptr. 324.) Here, the narcotics were recovered, entered into evidence, and inspected by Meldrum, an expert in drug identification.
B. Sufficient Evidence Demonstrates Defendants Possessed Methadone and Morphine
Defendants claim insufficient evidence supports the methadone and morphine convictions (Counts Four and Five, respectively) because there was no *945 evidence "connecting" them to methadone and morphine, and because these pharmaceuticals were "attributable" to Mooring, Sr. We are not persuaded. Methadone and morphine were found at Davis and Mooring, Sr.'s home. This evidence is sufficient to establish Davis had constructive possession. ( People v. Busch (2010) 187 Cal.App.4th 150, 162, 113 Cal.Rptr.3d 683 [constructive possession may be shown by circumstantial evidence; inference of dominion and control easily established when the contraband is found in the defendant's residence]; People v. Saldana (1984) 157 Cal.App.3d 443, 455, 204 Cal.Rptr. 465 [constructive possession of drugs shown where defendant jointly occupied bedroom where drugs were found].) Darrell came to the residence when it was being searched, received a property receipt for the seized items, and later went to the police station to retrieve "his pills." Pill bottles linked Darrell to the residence; one pill bottle containing methadone was prescribed to "Mooring, Darrell." Simmons testified defendants possessed the pharmaceuticals for sale. Together, this evidence demonstrates Darrell had constructive possession of methadone and morphine. That some of the pills may have been prescribed to Darrell's father does not demonstrate defendants did not possess them. Defendants' arguments that Simmons offered "improper expert opinion" and testified to an incomplete hypothetical are not persuasive.
C. The Prosecution Did Not Establish Dihydrocodeinone/Vicodin Is a Controlled Substance Under Sections 11055 or 11056
Defendants argue Count One must be reversed because the prosecution failed *630 to establish dihydrocodeinone/Vicodin is a controlled substance. We agree.
As relevant here, section 11351 makes it a felony to possess for sale the controlled substances "specified in subdivision (b) or (c) of Section 11055" or in "in subdivision (h) of Section 11056."[12] The Attorney General concedes dihydrocodeinone is not listed in Section 11055, subdivisions (b) or (c) or section 11056, subdivision (h). The Attorney General, however, argues dihydrocodeinone is "the same controlled substance" as hydrocodone, which is listed in section 11055, subdivision (b). (See § 11053 [the "controlled substances listed ... in the schedules ... are included by whatever official, common, usual, chemical, or trade name designated"].) To support this argument, the Attorney General notes certain witnesses referred to dihydrocodeinone as hydrocodone, and that Dr. Manougian prescribed defendants *946 hydrocodone. According to the Attorney General, "the jury had a rational basis to infer that dihydrocodeinone was a controlled substance." We are not persuaded.
Our high court's decision in Davis, supra, 57 Cal.4th 353, 159 Cal.Rptr.3d 405, 303 P.3d 1179 is instructive. In that case, the defendant was charged with possession of 3,4-methylenedioxymethamphetamine (MDMA), a substance not specifically listed as a controlled substance. ( Id. at pp. 356, 358, 159 Cal.Rptr.3d 405, 303 P.3d 1179.) The jury was only given the scientific name of MDMA and was not presented with expert testimony as to whether MDMA met the definition of a controlled substance or analog. ( Id. at pp. 360, 359, 159 Cal.Rptr.3d 405, 303 P.3d 1179.) On appeal, the defendant argued there was insufficient evidence that MDMA was a controlled substance.
The California Supreme Court agreed. First, it noted "the jury may find that MDMA is a controlled substance or analog based on evidence of MDMA's chemical composition or its effects on the user. Here, ... the record contains neither a stipulation nor testimony establishing that MDMA meets the definition of a controlled substance or analog." ( Davis, supra, 57 Cal.4th at p. 359, 159 Cal.Rptr.3d 405, 303 P.3d 1179.) The Davis court continued, "While the Court of Appeal, having referred to outside sources, satisfied itself that the pills in question qualified as a controlled substance, those sources were not before the jury. [Citation.] All the jury had before it was a chemical name not listed in any schedule of the code. An appellate court cannot take judicial notice of additional facts the prosecution failed to prove at trial to affirm a conviction." ( Id. at p. 360, 159 Cal.Rptr.3d 405, 303 P.3d 1179.) The court also rejected the argument that the jury could rely on common knowledge or common sense that MDMA contained methamphetamine because it was included in the scientific name. ( Ibid. )
Davis ultimately concluded: "Because it is not specifically listed in any schedule, evidence of MDMA's chemical name, standing alone, is insufficient to prove that it contains a controlled substance or meets the definition of an analog. '[T]he matter in issue is ... not within the common knowledge of laymen.' [Citation.] Thus, it was incumbent on the People to introduce competent evidence or a stipulation about MDMA's chemical structure or effects. Without such evidence, there was no rational basis for a jury of laypersons to infer that 3,4-methylenedioxymethamphetamine contains methamphetamine or amphetamine, *631 or that it has a substantially similar chemical structure or effect to methamphetamine or amphetamine." ( Davis, supra, 57 Cal.4th at pp. 361-362, 159 Cal.Rptr.3d 405, 303 P.3d 1179, fn. omitted.)
Here, defendants were charged with possessing "Dihydrocodeinone, a controlled substance," for sale. The jury was told dihydrocodeinone would be referred to as Vicodin, and it convicted defendants of possessing "dihydrocodeinone/ Vicodin" for sale. Neither dihydrocodeinone nor Vicodin *947 are listed as controlled substances in sections 11055 or 11056. As in Davis , "[a]ll the jury had before it was a chemical name not listed in any schedule of the code." ( Davis, supra, 57 Cal.4th at p. 360, 159 Cal.Rptr.3d 405, 303 P.3d 1179.) Defendants were not charged with, or convicted of, possessing hydrocodone for sale and the prosecution did not prove dihydrocodeinone is hydrocodone. "In short, 'the prosecution simply failed to close a[n] ... evidentiary gap mandated by the terms of the statute ... allegedly violated.' [Citation.] Because it is not specifically listed" in sections 11055 or 11056, evidence that defendants possessed dihydrocodeinone/Vicodin is insufficient to establish they possessed a controlled substance in violation of section 11351. " '[T]he matter in issue is ... not within the common knowledge of laymen.' " ( Davis, at p. 361, 159 Cal.Rptr.3d 405, 303 P.3d 1179.)[13]
Defendant's conviction for possessing dihydrocodeinone/Valium for sale ( § 11351, Count One) must be reversed, and the cause remanded for resentencing.
IV.-V.***
DISPOSITION
Defendants' conviction for possession of dihydrocodeinone/Vicodin ( § 11351, Count One) is reversed, and the cause is remanded for resentencing. In all other respects, the judgment is affirmed.
We concur:
Needham, J.
Bruiniers, J.

All undesignated statutory references are to the Health and Safety Code. We refer to Darrell by his first name for clarity.

Soto booked several pill bottles into evidence, including: (1) one prescribed to "Mooring, Darrell" and containing methadone ; (2) one prescribed to "Lanita Davis" and containing hydrocodone ; and (3) one prescribed to "Darrell Mooring, Jr." and containing hydrocodone.

Prescription pill manufacturers register a pill's markings, color, and shape with the Food and Drug Administration (FDA). The Ident-A-Drug Web site is located at: < http://identadrug.therapeuticresearch.com> (as of Sept. 27, 2017).

A similar method of identifying a prescription pill is comparing the pill's marking to images in the Physicians' Desk Reference, an encyclopedia of drugs.

Dihydrocodeinone is an opiate-based drug; its "common name" is Vicodin.

See footnote *, ante.

The parties filed supplemental briefs discussing the application of Sanchez to Meldrum's testimony.

Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (Melendez-Diaz ) explained: " 'Most of the hearsay exceptions covered statements that by their nature were not testimonial-for example, business records or statements in furtherance of a conspiracy.' [Citation.] Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because-having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial-they are not testimonial." (Id. at p. 324, 129 S.Ct. 2527.)

Courts in other jurisdictions have reached similar results. (U.S. v. Schrock (6th Cir. 1988) 855 F.2d 327, 334 [federal courts do not require "scientific identification of a substance [a]s an absolute prerequisite to conviction for a drug-related offense"]; U.S. v. Walters (1st Cir. 1990) 904 F.2d 765, 770 [same]; Jones v. Com. (Ky. 2011) 331 S.W.3d 249, 254-255 ) ( [sufficient evidence supported conviction for trafficking in a controlled substance, in part because two "fully-qualified" chemists "visually identified" the drug by relating that "based upon the shape, color, and markings, the drug visually appeared to be alprazolam"] ); (State v. Carter (La.Ct.App. 2008) 981 So.2d 734, 744 [expert in forensic chemistry identified the "green pills" as containing hydrocodone by performing a "visual inspection and comparison with pictures in a book"]; State v. Stank (2005) 288 Wis.2d 414, 708 N.W.2d 43, 54-55 [forensic scientist identified a pill as OxyContin by, among other things, using Physician's Desk Reference]; Sterling v. State (Tex.Ct.App. 1990) 791 S.W.2d 274, 277 [pharmacist testified tablets were diazepam based on their appearance and markings].)

Defendants' challenge to their conviction for possessing codeine (Count Three) fails because section 11055 subdivision (b)(1)(G) lists codeine as a controlled substance, and Meldrum presumptively identified 113 pills as "codeine."

Section 11351 also prohibits the possession of Schedule III drugs for sale. Schedule III drugs are listed in Section 11056. Section 11056, subdivision (e) prohibits the possession of dihydrocodeinone when contained in a compound or mixture with other substances in certain specified proportions. (§ 11056, subd. (e)(1)-(4).) Meldrum testified dihydrocodeinone is a Schedule III drug, but she did not offer any evidence regarding the weight of dihydrocodeinone or whether it was combined with other substances as required by section 11056.

See footnote *, ante.