Filed 10/12/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059110 |
| v. | (Super. Ct. No. 19NF2186) |
| TYRUS ROMEALUS JENKINS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Cynthia M. Herrera, Judge.  Affirmed.

Edward Mahler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Tyrus Romealus Jenkins of first-degree burglary of a residence with a person present, second degree burglary of a car, attempted unlawful taking of the car, and misdemeanor possession of burglary tools. The court imposed a total prison sentence of 13 years. Jenkins contends his conviction for attempted unlawful taking of a vehicle must be reversed because the court permitted, over his objection, a police detective to testify to the car's estimated value obtained from the Kelley Blue Book's Web site. Jenkins asserts this was hearsay evidence that should have been excluded, and absent this testimony, there was no evidence establishing the car was worth more than $950, an element of the felony offense. We conclude the trial court properly admitted the evidence under Evidence Code section 1340, the published compilation exception to the hearsay rule.[1] Jenkins also contends his conviction for vehicular burglary must be reversed because the evidence was insufficient to prove the car was locked at the time of his entry. We conclude there was substantial circumstantial evidence establishing this element of the crime. Accordingly, we affirm the judgment.

FACTS

I. *Substantive Facts*

Husband and Wife were home around 7:30 a.m., when the alarm sounded on their 2010 Nissan Sentra parked in their driveway. About the same time, they were alerted to movement outside their home through a smartphone application connected to a security camera mounted above their garage. Wife looked outside and saw Jenkins standing between their two cars. She told Husband what she saw and that it appeared Jenkins went into their garage. Husband grabbed a piece of wood and went outside to confront him.

He found Jenkins searching through the refrigerator in the garage. Husband banged his wooden stick on the ground to get Jenkins's attention and told Jenkins to

_____

[1]        All further statutory references are to the Evidence Code, unless otherwise indicated.

2

leave.  Jenkins was carrying a backpack, and Husband noticed a hammer sticking partially out of it.  Jenkins shoved the hammer into his backpack and walked out of the garage.  Although Husband did not see Jenkins take anything from the garage, he later realized a plastic container with coins was missing.

As Jenkins was walking toward the street, Husband noticed the driver's side window of their Nissan Sentra was shattered.  There were also indications the driver's door had been pried away from the frame of the car.  Both the glove compartment and the center console of the car were open, and it appeared someone had rummaged through the car.  A piece of the ignition was broken off.  Husband called the police and gave them Jenkins's description.

Shortly thereafter, Jenkins was stopped by the police nearby.  When the police searched his backpack, they found a hammer, screwdriver, and pliers.  Inside his backpack, Jenkins also had an iPod and a garage door remote taken from inside the Nissan, as well as two plastic containers with coins.  In an in-field show-up, Husband identified Jenkins as the man he saw in his garage.

Jenkins was arrested and taken to the police station, where Detective Kenneth Johnson interviewed him.  In the interview, Jenkins admitted using the hammer to break the car's window and pry the door.  He explained he was looking for money because he was hungry, and he found some change inside the car.  He admitted he tried to start the car by using the claw end of the hammer to pry the ignition and probably would have taken the car if he had been able to start it.  He used the garage door opener he found inside the car to open the garage door.  He said he went into the garage and took water and soda from the refrigerator because he was hungry and dehydrated.

Johnson examined the damage to the Nissan.  He later used the Kelley Blue Book's Web site to determine the value of a base model 2010 Nissan Sentra because he did not know what amenities Husband and Wife's car had.  He obtained the trade-in

3

value of the car, which is the lowest value provided by the Kelley Blue Book, and it was $1,800 to $2,240.

II. *Procedural Facts*

An information charged Jenkins with residential burglary (Pen. Code, §§ 459, 460, subd. (a), count 1); vehicle burglary (Pen. Code, §§ 459, 460, subd. (b), count 2); attempted unlawful taking of a vehicle (Pen. Code, § 664, subd. (a); Veh. Code, § 10851, subd. (a), count 3); and misdemeanor possession of burglary tools (Pen. Code, § 466, count 4). The information alleged as to count 1 that a nonaccomplice was present in the residence at the time of the burglary. (Pen. Code, § 667.5, subd. (c)(21).) The information further alleged Jenkins was previously convicted of burglary and the prior offense qualified as a "strike" under the "Three Strikes" law (Pen. Code, §§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)) and a serious felony (Pen. Code, §667, subd. (a)(1)). The jury trial proceedings on the substantive charges were bifurcated from the trial on the prior conviction allegations.

During the trial on the substantive charges, the court conducted a section 402 hearing regarding Johnson's anticipated testimony that he obtained the value of the car from the Kelley Blue Book. The court ruled the evidence admissible under section 1340, over Jenkins's objections.[2] At trial, the prosecution offered the evidence detailed above. Jenkins presented no testimony in his defense but submitted a stipulation by the parties concerning the weather and temperature on the day of the incident.

The jury found Jenkins guilty of the charged offenses and found true the allegation that a nonaccomplice was present in the residence during the burglary. Jenkins waived his right to a jury trial on the prior conviction allegations, and the court found the allegations true following a bench trial.

---

[2]     Because Jenkins challenges this ruling by the court, we discuss the hearing and the court's ruling in more detail *post*.

4

The court sentenced Jenkins to prison for a total term of 13 years, consisting of eight years for residential burglary (midterm doubled due to Jenkins's prior strike offense) and a consecutive five years for the prior serious felony enhancement. It imposed a concurrent four-year term for Jenkins's conviction for vehicle burglary (midterm doubled), imposed a concurrent two-year term for attempted unlawful taking of a vehicle (midterm doubled), and stayed the sentence for possession of burglary tools under section 654. Jenkins timely appealed.[3]

## DISCUSSION

I. *The Court Properly Admitted Evidence of the Car's Value from the Kelley Blue Book*

Jenkins's conviction for felony attempted unlawful taking of a vehicle (count 3) required proof the vehicle was worth more than $950. (*People v. Jackson* (2018) 26 Cal.App.5th 371, 378.) The prosecution's evidence concerning the car's value came from Johnson, who testified he used the Kelley Blue Book's Web site to determine the car's trade-in value was $1,800 to $2,240. Jenkins contends his conviction must be reversed because Johnson's testimony concerning the Kelley Blue Book's valuation of the car was inadmissible hearsay that did not qualify for admission under the published compilation exception in section 1340, and absent this inadmissible evidence, there was no other evidence the car's value exceeded $950. We disagree. We conclude the testimony concerning the Kelley Blue Book's valuation of the car was properly admitted under section 1340.

---

[3] We grant Jenkins's request for judicial notice of: (1) Chief Justice Cantil-Sakauye's order dated April 24, 2020, regarding operations of the Superior Court of Orange County during the pandemic; (2) Presiding Judge Nakamura's third implementation order regarding emergency order dated April 24, 2020 (§§ 452, subd. (c), 459, subd. (a)); and (3) the calendar dates May 23, 2020 through May 25, 2020 (§§ 452, subd. (h), 459, subd. (a); see *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936 [taking judicial notice of the calendar to determine timing requirements]).

5

A. *Background*

Prior to opening statements, the prosecutor informed the court he "wanted to iron out" an issue before Johnson testified as the prosecutor intended to prove the value of the car through the detective's testimony. The prosecutor explained Johnson's testimony would be he determined the car's value by using the Kelley Blue Book, and the prosecutor argued this evidence was admissible under section 1340. Defense counsel objected to the testimony on hearsay and foundation grounds. The court deferred the issue to allow itself and the defense time to research the prosecution's case law.

When the court took the matter up later, defense counsel supplemented his initial objection with objections based on *Crawford v. Washington* (2004) 541 U.S. 36 and *People v. Sanchez* (2016) 63 Cal.4th 665. Defense counsel argued the car's estimated value from the Kelley Blue Book was not admissible under section 1340 because it was "an opinion of what an average price would be for a particular make and model of a vehicle" and not a directory or list of vehicle prices. The prosecutor argued the information from the Kelley Blue Book was not an opinion but a tabulation of sales that have occurred for similarly priced vehicles. The court indicated a section 402 hearing would be needed for the prosecution to try to lay the necessary foundation for admission of the evidence under section 1340.

At the evidentiary hearing, Johnson testified he was a detective in the police department's auto theft and burglary unit and that he used the Kelley Blue Book as part of his job and relied on it when determining a vehicle's value. In his work experience, he had used the Kelley Blue Book at least 25 times to determine a vehicle's value and had used it in his personal life additional times. He had spoken to many car dealers who indicated they also used the Kelley Blue Book for determining vehicle trade-in values. Johnson described the Kelley Blue Book as "a recognized nationwide database that consumer and retail personnel use to gauge the estimate for values of a vehicle," and

6

he explained how a user obtains a car's value by using the Kelley Blue Book's free Web site.

Johnson explained in this case, he obtained information concerning the Nissan Sentra and visually inspected it but did not see extensive external damage that would devalue the car. Using the Kelley Blue Book's Web site, he entered information about the car and the pertinent zip code and obtained a trade-in value for the car. The information he received from the Kelley Blue Book was "computer-generated information" as opposed to information provided by a live person.

On cross-examination, Johnson indicated he did not know how the Kelley Blue Book obtained the information it used to provide a vehicle's estimated value nor did he know how frequently the Kelley Blue Book updated its information. And he was not aware of other pricing methods to determine whether the information provided by the Kelley Blue Book was accurate.

In arguing the evidentiary issue, the prosecutor asserted evidence of the car's value from the Kelley Blue Book was not a hearsay statement because it was computer generated.[4] The prosecutor further argued if it was hearsay, it was admissible as a compilation under section 1340. The defense argued the evidence should be excluded as hearsay because it did not satisfy the requirements of section 1340.

The court ruled the evidence concerning the car's value was admissible under section 1340 because the statement was contained in a published compilation. In its ruling, the court indicated it was assuming for the purposes of its analysis that the valuation was an out-of-court statement and thus hearsay, rather than computer-generated information. The court found Johnson's testimony demonstrated the published compilation was used and relied upon as accurate in the course of business. The court

---

[4]         The Attorney General does not pursue this theory on appeal. Therefore, we express no opinion as to its viability.

later supplemented the record to explain its analysis in admitting the testimony, explaining it concluded the evidence, while hearsay, was not testimonial.

B. *Hearsay and Section 1340*

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" (§ 1200, subd. (a)), and hearsay evidence is inadmissible "[e]xcept as provided by law" (*id.*, subd. (b)). This is commonly referred to as "the hearsay rule." (*Id.*, subd. (c).) Jenkins argues Johnson's testimony concerning the Kelley Blue Book's estimate of the car's value was hearsay, and the Attorney General does not disagree. Their dispute lies in whether the court properly admitted the evidence under the "published compilation exception to the hearsay rule" in section 1340. (*People v. Espinoza* (2018) 23 Cal.App.5th 317, 319.)

Section 1340 provides: "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business as defined in Section 1270."[5] Five elements must be satisfied when a party seeks to admit evidence under the published compilation exception: "(1) the proffered statement must be contained in a 'compilation'; (2) the compilation must be 'published'; (3) the compilation must be 'generally used . . . in the course of a business'; (4) it must be 'generally . . . relied upon as accurate' in the course of such business; and (5) the statement must be one of fact rather than opinion. [Citation.]" (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1206 (*Franzen*).) Here, in admitting Johnson's testimony regarding the Kelley Blue Book's valuation of the car, the trial court found each of these elements had been satisfied. We review the court's factual

---

[5] Section 1270 states, "'[A] business' includes every kind of business, governmental activity, profession, occupation, calling, or operation of institutions, whether carried on for profit or not."

findings for substantial evidence and its ultimate evidentiary ruling for an abuse of discretion. (*People v. Caro* (2019) 7 Cal.5th 463, 503.)

We analyze the first two elements in tandem, considering whether substantial evidence supports the court's finding that the Kelley Blue Book is a "published compilation." (§ 1340.) Our analysis begins by looking at the statutory language to determine what is encompassed therein. Section 1340 lists specific examples of compilations as coming within its scope—"a tabulation, list, directory, [or] register"— in addition to the catch-all "other published compilation." A characteristic all of these items "have in common [is] the presentation of information in a fixed, organized, and usually written form." (*Franzen, supra*, 210 Cal.App.4th at p. 1210.) The *Franzen* court, after reviewing "[t]he history, language, and rationale of section 1340," concluded the statute "contemplates an organized, edited presentation of a finite quantity of information that, if not printed on paper, has been recorded and circulated in some fixed form analogous to printing." (*Id.* at p. 1209.)

Jenkins does not challenge the court's finding that the Kelley Blue Book is printed or "published" as required by section 1340. In the trial court, he acknowledged it was originally printed in book form and is now available on the Internet. (See *People v. Mooring* (2017) 15 Cal.App.5th 928, 938 (*Mooring*) [finding Ident-A-Drug Web site is a compilation "'published' on the Internet"]; see *Franzen, supra*, 210 Cal.App.4th at p. 1213 [conversion from printed volume to digital form "should not, by itself, interfere with the treatment of such materials as published compilations"].) Thus, we focus on whether the court properly found the Kelley Blue Book is a compilation.

When evaluating the admissibility of evidence under section 1340, some courts have examined the definitions of compile and compilation to get a better idea of what the statute envisions. (See *Franzen, supra*, 210 Cal.App.4th at p. 1210; *Mooring, supra*, 15 Cal.App.5th at p. 938.) We do the same. Compilation is defined as "the act or action of gathering together written materials esp. from various sources." (Webster's 3d

9

New Internat. Dict. (2002) p. 464, col. 1.)  "To compile means '"[t]o collect and put together (materials), so as to form a treatise; to collect into a volume," and "[t]o make, compose, or construct (a written or printed work) by arrangement of materials collected from various sources."'  [Citations.]"  (*Mooring, supra*, 15 Cal.App.5th at p. 937.)

With these definitions in mind, we look at the evidence presented below and conclude substantial evidence supports the court's finding that the Kelley Blue Book constitutes a published compilation within the meaning of section 1340.  Johnson described the Kelley Blue Book as a "nationwide database" used by consumers and retail personnel to determine the values of vehicles.  He explained a person can enter certain information about a car on the Kelley Blue Book's Web site and the Web site provides a "calculation" of the vehicle's worth based on the information provided, with ranges in value for private party sales or trade-ins.  Thus, the Kelley Blue Book compiles or puts together information concerning vehicle values, which vary depending on certain criteria like the type of car, its condition, amenities, location, and type of sale.  This evidence demonstrates the Kelley Blue Book is a published compilation under section 1340.

Next, we consider in tandem the third and fourth elements for admissibility under section 1340—whether "the compilation is generally used and relied upon as accurate in the course of a business . . . ."  (§ 1340; *Franzen, supra*, 210 Cal.App.4th at p. 1206, fn. 3.)  Again, substantial evidence supports the court's findings these elements were satisfied.  Johnson testified he regularly used the Kelley Blue Book in determining the value of vehicles as part of his job as a law enforcement officer and specifically as a detective in the auto theft and burglary unit.  He testified he had spoken to many car dealers who also used it to determine the trade-in values of cars.  He explained consumers can also use it to determine a car's value.  Johnson's testimony was sufficient to prove the Kelley Blue Book is a compilation of vehicle values used by consumers, retailers, and police officers.

10

Although Johnson did not explicitly state he relied upon the Kelley Blue Book's valuations to be accurate, this can be reasonably inferred from his testimony. He testified he regularly used it as a law enforcement officer for estimating a car's worth and that many car dealers used it for determining trade-in values. Regular use of the Kelley Blue Book by law enforcement officers and car dealers supports the inference it is relied upon as accurate. Thus, based on the evidence presented, we conclude the Kelley Blue Book is generally used and relied upon as accurate for the purpose of calculating a vehicle's value.

Jenkins argues the evidence presented below was insufficient to establish the Kelley Blue Book's reliability. He contends the Kelley Blue Book's Web site "[a]s described by Johnson . . . is nothing more than a query based site where the user inputs certain information about the make, model and year of some car and the site 'spits out' a purported value range without anything establishing the source or reliability of the information from which this value was derived." Jenkins asserts the prosecution did not prove reliability because it did not present evidence as to how the Kelley Blue Book calculates the vehicular values it provides or how frequently it updates the information on its Web site. Jenkins's argument is not persuasive. A party seeking to admit evidence under section 1340 does not have to show *how* the compilation was made, only that once made, the compilation is "generally used and relied upon as accurate . . . ." (§ 1340.) This the prosecution did.

In arguing the court erred by admitting the evidence under section 1340, Jenkins emphasizes his argument is not that the Kelley Blue Book is patently unreliable, just that the prosecution in his case failed to show it "is a compilation derived from reliable information." While we have considered his appellate claim based on the evidence presented below, we do not ignore the statutory and decisional law that recognizes the Kelley Blue Book's reliability for providing the market values of vehicles. For example, Vehicle Code section 11950 requires a used car dealer to display a label on

11

the car stating its "reasonable market value" (*id.*, subd. (a)), which the statute defines as determined "by a nationally recognized pricing guide" (*id*., subd. (c)(1)), like "the Kelley Blue Book" (*id.*, subd. (c)(2)).  Similarly, Civil Code section 2987, which concerns leased vehicles, identifies the Kelley Blue Book as "a recognized used vehicle value guide customarily used by California motor vehicle dealers to value vehicles in this state."  (*Id.*, subd. (c).)

In *Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, the appellate court identified the Kelley Blue Book as "a widely accepted source" for objectively obtaining the retail value of a car.  (*Id.* at p. 56.)  Federal bankruptcy courts have also commented on the use and reliability of the Kelley Blue Book.  One court explained:  "The public relies on Kelley Blue Book values to make informed car purchase decisions.  The publishers of the Kelley Blue Book 'know that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting their product.'  [Citation.]"  (*In re Gonch* (Bankr. N.D.N.Y. 2010) 435 B.R. 857, 862 [concluding "the Kelley Blue Book private party value falls squarely within the hearsay exception for commercial publications" under Fed. Rules Evid., rule 803(17), 28 U.S.C.].)[6] Bankruptcy courts generally rely on the Kelley Blue Book and the National Automobile Dealers Association guidebook to determine replacement values.  (See *In re Finnegan* (Bankr. M.D.Pa. 2006) 358 B.R. 644, 649.)

Lastly, we examine the court's finding that the Kelley Blue Book's valuation of the car was a statement of fact rather than an opinion.  Neither party analyzes this element in depth.  The Attorney General asserts the dollar range of the Nissan's value "was a statement of fact based on the selling prices of similar vehicles in the area."  But

_____

[6]        Rule 803(17), of the Federal Rules of Evidence (28 U.S.C.) provides an exception to the hearsay rule for:  "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."  Thus, there are some variations between the federal rule and section 1340.

12

this was not established by Johnson's testimony. Johnson testified he did not know how the Kelley Blue Book determined a car's value, only that the price might vary depending on certain factors. Jenkins contends, "Without any evidence or information as to where the [Kelley Blue Book] derived its value range[,] there is nothing establishing that it [is] anything more than an opinion from sources unknown." Again, Jenkins's argument misses the mark. To lay the foundation for admission under section 1340, the prosecution did not have to produce evidence of the information the Kelley Blue Book relies upon or its formula for calculating vehicle values.

We find illuminating *Franzen*'s discussion of section 1340's history because it reveals the Kelley Blue Book's compilation of vehicle values is the type of statement of fact (rather than opinion) the drafters envisioned falling within this hearsay exception. *Franzen* stated: "According to the drafters of the Evidence Code, section 1340 merely 'codifie[d] an exception' to the hearsay rule 'that ha[d] been recognized by statute and by the courts in specific situations.' [Citations.] They cited three authorities illustrating statements within the exception: California Uniform Commercial Code section 2724, which authorizes proof of a commodity's market price by 'reports in official publications or trade journals or in newspapers or periodicals of general circulation published as the reports of such market'; *Emery v. Southern Cal. Gas Co.* (1946) 72 Cal.App.2d 821, 824-826 [citation], which authorized the admission of standard annuity tables to show present value; and *Christiansen v. Hollings* (1941) 44 Cal.App.2d 332, 339-340 [citation], which held standard mortality tables admissible to show life expectancy." (*Franzen, supra*, 210 Cal.App.4th at p. 1206.) The Kelley Blue Book is essentially a market price report for vehicles, and its breakdown of values is comparable to standard annuity or mortality tables.

Addressing the use and reliability of published compilations, *Franzen* explained: "In the paradigmatic situation, a published compilation is a volume or other printed work in which a business *looks up* some *fact* that it will use in seeking financial

13

gain or avoiding loss.  A business trading in commodities relies on published prices in the sense that it *accepts them as true*, entering into contracts at those prices—contracts on which it stands to gain or lose money.  Actuaries and their clients likewise trust present value tables and mortality tables to enable them to calculate the true costs and risks on which a business or investment decision may depend.  There is of course no *guarantee* of accuracy in such cases; a value may be miscalculated, misreported, misentered, or misprinted.  But the user considers it highly likely that the information is accurate—likely enough that *he treats it as true*.  In effect users *bet* on the accuracy of such a publication.  Publishers, likewise, 'stake their business or public reputations *on* [*its*] *accuracy*.' [Citation.]"  (*Franzen, supra*, 210 Cal.App.4th at p. 1213.)  The Kelley Blue Book, like the compilers of other commodity price reports and actuarial tables, knows its product only has value if it is accurate, thus reasonably ensuring the trustworthiness of the compilation.  (*In re Gonch, supra*, 435 B.R. at p. 862; see *Miller v. Modern Business Center* (1983) 147 Cal.App.3d 632, 635 ["Trustworthiness is reasonably assured by the fact that the business community generally uses and relies upon the compilation and by the fact that its author knows the work will have no commercial value unless it is accurate"].)

We conclude substantial evidence supports the trial court's finding the information Johnson obtained from the Kelley Blue Book regarding the Nissan's value was a statement of fact as envisioned by section 1340, rather than an opinion.  Having found the elements of the published compilation hearsay exception were established, we conclude the trial court did not abuse its discretion by admitting evidence of the car's valuation from the Kelley Blue Book.

This is not the first time we have addressed whether the Kelley Blue Book comes within the ambit of section 1340.  We briefly addressed the issue in *People v. Zorich* (2020) 55 Cal.App.5th 881 (*Zorich*).  There, we commented that a source such as the Kelley Blue Book "is admissible over a hearsay objection . . . 'if the compilation is

14

generally used and relied upon as accurate.' [Citation.]" (*Id.* at p. 888.) We noted the Kelley Blue Book has been recognized as "'a widely accepted source' for the value of vehicles. [Citation.]" (*Ibid.*)

Jenkins argues his case is distinguishable from the situation in *Zorich, supra*, 55 Cal.App.5th 881. We agree *Zorich* is distinguishable both procedurally and factually. In *Zorich*, defendant appealed from the trial court's order denying his Proposition 47 petition for recall and resentencing of his convictions for grand theft of an automobile and unlawful taking and driving a vehicle. (*Zorich, supra*, 55 Cal.App.5th at pp. 883-884.) To support his petition to reduce his felony convictions to misdemeanors, defendant submitted pages from the Kelley Blue Book indicating the vehicle was valued less than $950 at the time of the theft. (*Id.* at p. 887.) We noted defendant's Kelley Blue Book evidence was "probably the most probative evidence a defendant could be reasonably expected to produce" to establish a vehicle's value for purposes of resentencing under Proposition 47, and we concluded the evidence was relevant and admissible. (*Id.* at p. 887-888.)

But in *Zorich*, unlike the instant matter, there was no objection to the Kelley Blue Book valuation evidence and the admissibility of the evidence was not litigated in the trial court. (*Zorich, supra*, 55 Cal.App.4th at p. 888.) We identified section 1340 as a potential theory of admissibility but did not fully analyze the theory at that time because it was unnecessary under the circumstances. Now, having performed the full analysis based on the evidence in this case, we reach the same conclusion that evidence of a vehicle's value from the Kelley Blue Book is admissible under section 1340.

Our conclusion is consistent with published decisions that have considered the admissibility of certain evidence under the published compilation exception in section 1340. In *Mooring*, the Court of Appeal upheld the admission of an expert's testimony discussing her use of the Ident-A-Drug Web site to presumptively identify

15

pharmaceutical pills. (*Mooring, supra*, 15 Cal.App.5th at pp. 932-934.) The *Mooring* court concluded the Ident-A-Drug Web site, a searchable database containing information from a government agency and pharmaceutical companies regarding prescription pills, was a published compilation under section 1340. (*Mooring, supra*, 15 Cal.App.5th at pp. 937-939.) The same conclusion was reached in *People v. Espinoza* (2018) 23 Cal.App.5th 317, where a different appellate court concluded "Ident-A-Drug, an Internet drug reference work, comes within the published compilation exception to the hearsay rule set forth in Evidence Code section 1340." (*Id.* at p. 319.) The Kelley Blue Book's Web site is similar to the Ident-A-Drug Web site in that they both compile information and arrange the materials collected in a manner that allows an individual to search and obtain pertinent results through an online database. Other examples of published compilations admitted under section 1340 include data from federal traffic safety databases (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1494, 1516); a label listing ingredients on a spray paint can (*In Michael G.* (1993) 19 Cal.App.4th 1674, 1677-1678); and survey results measuring magazine readership (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1275-1277).

Jenkins relies heavily on *Franzen, supra*, 210 Cal.App.4th 1193, to support his contention the court erred by admitting the Kelley Blue Book's valuation of the car under section 1340. In *Franzen*, the Court of Appeal held the trial court erred by admitting under section 1340 evidence obtained from the Web site "Entersect." (*Franzen, supra*, 210 Cal.App.4th at p. 1197.) There, the defense objected on hearsay and foundation grounds to the detective's testimony that by using the Web site, he identified defendant as the owner of a cell phone used in a drug sale. (*Id.* at p. 1204.) The prosecutor endeavored to lay the foundation for admission of the evidence under section 1340. (*Ibid.*) The detective explained the police department paid a fee to use the Web site, which "has a database of telephone numbers." (*Ibid.*) He indicated that if a user enters a telephone number, the Web site provides "'whatever information that's out

16

there within the internet that might be assigned to'" the number.  (*Ibid.*)  When the prosecutor asked if the Web site was a directory or list, the detective agreed directory was a good way to describe it.  (*Id.* at p. 1205.)  The Court of Appeal was not convinced.

The *Franzen* court concluded the database from which the detective extracted the evidence bore "virtually no resemblance to a 'published compilation' as" envisioned by the language, rationale, and history of section 1340.  (*Franzen, supra*, 210 Cal.App.4th at p. 1210.)  The appellate court was particularly concerned about reliability of the information given "the persistence in the digital universe of outdated information," noting that a person's connection with a telephone number may be broken when the person moves or changes carriers.  (*Id.* at p. 1211.)  Because the detective did not explain how he used the information he obtained or how the police department or other businesses had used similar information from the Web site in the past, the *Franzen* court concluded the prosecution failed to show the information amassed on the Web site was generally used and relied upon as accurate.  (*Id.* at p. 1214.)

However, the concerns that distressed the court in *Franzen* are not present in this case.  The Kelley Blue Book's compilation of vehicle values is akin to the commodity lists and actuarial tables the statute was intended to encompass.  The Kelley Blue Book, unlike Entersect, contains "information that . . . has been recorded and circulated in some fixed form analogous to printing."  (*Franzen, supra*, 210 Cal.App.4th at p. 1209.)  And the prosecution presented evidence the Kelley Blue Book is used for providing the market prices of vehicles and relied upon as being accurate in the course of business by both law enforcement and car dealerships.  Thus, we conclude the court did not abuse its discretion by admitting Johnson's testimony concerning the Kelley Blue Book's valuation of the car.  Accordingly, Jenkins's conviction for attempted unlawful taking of a vehicle is affirmed.

17

II. *Substantial Evidence Supports Jenkins's Vehicle Burglary Conviction*

Jenkins contends his vehicle burglary conviction must be reversed because there was no direct evidence the car was locked at the time of his entry. We disagree.

A vehicle burglary is committed when a defendant enters a locked vehicle with the intent to commit larceny. (§ 459; *In re James B.* (2003) 109 Cal.App.4th 862, 867; *People v. Allen* (2001) 86 Cal.App.4th 909, 914 ["Auto burglary can be committed only by entering a locked vehicle without the owner's consent"].) "The requirement of locking as an element of vehicular burglary has been interpreted to mean 'that where a defendant "used no pressure," "broke no seal," *and* "disengaged no mechanism that could reasonably be called a lock," he is not guilty of auto burglary. [Citations.]' [Citation.] Therefore, 'because auto burglary can be committed only by entering a *locked* vehicle without the owner's consent, it is only accomplished by altering the vehicle's physical condition; at worst, by smashing a window, at best, by illegally unlocking it. These extremes, as well as other possible types of forcible entries, necessarily involve unlawfully altering the vehicle's locked state.' [Citation.]" (*In re James B., supra*, 109 Cal.App.4th at p. 868.)

We apply the familiar substantial evidence test to determine whether there was insufficient evidence the car was locked. "Upon a challenge to the sufficiency of evidence for a jury finding, we ""'"review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'"' [Citation.] 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 323-324.)

Jenkins acknowledges there was circumstantial evidence the car was forcibly entered as the driver's window was shattered, but he contends this evidence was insufficient to prove the necessary element the car was locked at the time of entry. The

18

Attorney General argues "comprehensive circumstantial evidence" established the car was locked. We agree with the Attorney General.

We conclude there was substantial evidence from which the jury could find the car was locked prior to Jenkins's entry. The most obvious sign was the shattered driver's side window. There were also indications an attempt had been made to pry the driver's door from the car's frame. And there was testimony the car's alarm went off while Jenkins was seen standing by the car. The jury could also consider in conjunction with this evidence, Jenkins's statements to the police. (CALCRIM No. 358 ["Evidence of Defendant's Statements"]; CALCRIM No. 359 ["Corpus Delicti: Independent Evidence of a Charged Crime"].) Jenkins admitted using his hammer to break the car's window and to pry the door from the frame. None of this would have been necessary if he found the car unlocked.

Jenkins relies on *People v. Burns* (1952) 114 Cal.App.2d 566 (*Burns*) to support his argument that evidence of a broken window is insufficient to prove the car was locked at the time of entry. In *Burns*, the court reversed a vehicle burglary conviction because there was no direct evidence the car was locked, even though the evidence showed a windwing was broken and there was glass on the front seat. The court found the inference the doors were locked could not be drawn from the evidence of a broken window because there was no evidence as to the condition of the window at the time the car was parked in the lot. (*Id.* at p. 570.)

The facts in Jenkins's case are readily distinguishable. Here, unlike *Burns*, there was evidence as to the window's condition prior to entry as Husband testified the window was not broken the night before. Thus, Jenkins's reliance on *Burns* is misplaced.

As the Attorney General points out, this case is similar to *People v. Rivera* (2003) 109 Cal.App.4th 1241. There, in the early morning hours, a police officer saw defendant come out of a car that had a broken window and saw defendant throw down a screwdriver before fleeing. (*Id.* at p. 1243.) The interior of the car was in disarray and a

19

witness testified the car's window was not broken the afternoon before the incident. (*Ibid.*) Relying on *Burns,* defendant argued the evidence was insufficient to support his conviction. (*Id.* at pp. 1243-1244.) The *Rivera* court disagreed, explaining: "It is not rational to conclude the car here was not locked. It was uncontested that when police arrived during the burglary, the car window had been broken and it was not broken six or eight hours earlier. It is not rational to conclude someone would break a car window in the early morning hours in order to enter a car that is unlocked. Substantial circumstantial evidence supports the finding necessary to a conviction that the car was locked when the entry occurred." (*Id.* at p. 1245.)

We reach the same conclusion based on the evidence in this case. We conclude there was substantial evidence, albeit circumstantial, that the car was locked and Jenkins altered its locked status in order to enter with the intent to commit larceny. Accordingly, we affirm Jenkins's conviction for vehicle burglary.

### DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

MOORE, J.

20